

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).



I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL, POSTAGE PREPAID, TO ALL COUNSEL
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD IN THIS ACTION, ON THIS DATE.

DATE

DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TROVAN, LTD., a corporation of the United Kingdom; and ELECTRONIC IDENTIFICATION DEVICES, LTD., a California corporation,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>PFIZER, INC., a Delaware Corporation,<br><br>　　　　　　　　　Defendant. | CV-98-0094 LGB (MCx)<br><br>ORDER GRANTING AND DENYING DEFENDANT'S POST TRIAL MOTIONS; AND DENYING PLAINTIFFS' POST TRIAL MOTIONS |



Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

## I.    INTRODUCTION

Plaintiffs are Trovan, Ltd. and its exclusive licensee EID, Inc.[1]  Both plaintiffs are fairly small companies.  Defendant is Pfizer, Inc., a large drug manufacturer.  Plaintiffs sued defendant for trademark infringement, alleging both forward and reverse confusion.  Having defeated defendant's motion for summary judgment based on the theory of reverse confusion, this case came to trial. After finding that defendant infringed plaintiffs' trademark, the jury awarded plaintiffs $8,000,000 ($5,000,000 in general damages

---

[1]    InfoPET, although not a party in this case, is the distributor of plaintiffs' animal identification products.



1 | and $3,000,000 in reasonable royalties) in compensatory damages and

2 | $135,000,000 in punitive damages.  Defendant filed an array of post-

3 | trial motions challenging the verdict, asking for a new trial, and

4 | challenging prior Court orders.  Plaintiffs also filed a motion to

5 | re-tax costs and a motion for attorneys' fees and non-taxable costs.

6 | **II.   FACTUAL AND PROCEDURAL BACKGROUND**

7 | **A.   Plaintiffs' Product**

8 | Since the early 1990s, plaintiffs have been selling passive

9 | transponder systems designed to overcome the limitations of bar

10 | codes for identification purposes under the name Trovan.  (Official

11 | Reporter Trial Transcript page ("Tr.") 880.)  On July 2, 1991, the

12 | United States Patent and Trademark Office issued plaintiff Trovan a

13 | federal trademark registration for the name "Trovan."  (Percy Decl.

14 | Ex. 26.)  Plaintiffs sell different kinds of transponders for

15 | different uses. The Trovan ID-100A transponder was used for the

16 | identification of animals, including pets.  (Tr. 1414.)  This

17 | transponder was sold as the Trovan ID-100 with a syringe to inject

18 | the transponder under the animal's skin.  (Tr. 496, 788-89.)  In

19 | 1996, Trovan was permanently enjoined from selling this product

20 | because it infringed on Destron-Fearing's patent.  (Tr. 496-98.)

21 | In October 1997, plaintiffs licensed the Zip Quill technology

22 | from Hopliet B.V.  (Tr. Ex. 923 (Pagac Decl. Ex. 27).)  The Trovan

23 | Zip Quill transponder was intended to replace the enjoined ID-100.

24 | (Tr. 501.)  The Trovan Zip Quill is a radio frequency identification

25 | device encased in a starch compound with the microchip 100A in it

26 | surrounded by the starch compound.  (Tr. 1411.)  The Trovan Zip

27 | Quill was designed especially for animal identification.  (Tr. 795,

28 | 2792.)  Plaintiffs' other transponders have been used in a variety

-2-

1   of industrial and commercial settings for identification purposes,

2   including laundry and to ear tag livestock.   (Tr. 498-500.)[2]

3       Joseph Masin, EID's president, testified that his company is

4   planning to use the Zip Quill as a delivery device for human

5   pharmaceuticals.   (Tr. 796.)   In February 1999, Mr. Masin sent a

6   letter to the Food and Drug Administration seeking approval for such

7   use.   (Tr. 1032; Tr. Ex. 446 (Pagac Ex. 28).)   In late March, the

8   FDA informed Mr. Masin that it would only review such application

9   "in the context of an application for a specific drug or

10  biological."   (Tr. Ex. 446 )Pagac Decl. Ex. 28).)   According to Mr.

11  Masin, negotiations are ongoing with several companies, but no deal

12  has been consummated with anyone.   (Tr. 1021-22.)

13      **B.   Defendant's Product**

14      On October 28, 1996, Pfizer filed an application with the

15  Patent and Trademark Office ("PTO") to register Trovan in

16  International Class 5 (pharmaceuticals) for an antibiotic

17  preparation, based on Pfizer's intent to use the mark.   (Trial Ex.

18  437 (Pagac Decl. Ex. 38).)   The PTO eventually issued a Certificate

19  of Registration for that mark on August 18, 1998 (Tr. Ex. 1042

20  (Pagac Decl. Ex. 44).)   Based on Pfizer's "intent to use"

21  application filed on October 28, 1996, the effective date on

22  Pfizer's trademark registration referred back to that date.   In

23  February 1998, Pfizer began selling a new antibiotic, trovafloxacin,

24  marketed as Trovan.   (Tr. 1675.)   Pfizer's antibiotic was sold only

25  by prescription, and only for human use.   (Tr. 1669-1670.)

26  ///

27

28      [2]   Plaintiffs' products have been used to track oxygen
    bottles, surgical clothing, hospital beds, blood, breast implants.
    (Tr. 919, 926, 981, 1004, 1203, 1204-05.)

C.   **Procedural Background**

On August 18, 1999, this case came to trial.  The trial was conducted in three phases.  The first two phases were tried to a jury.  The third phase was tried before the Court.  In the first phase, defendant's liability pursuant to the Lanham Act and California unfair competition common law was tried.  On September 22, 1999, the jury returned a liability verdict on both claims.  In the second phase, compensatory and punitive damages were tried.  On October 12, 1999, the jury returned an $8,000,000 compensatory damage and $135,000,000 punitive damage verdict.  Finally, in the third phase, defendant's profits from the sale of the Trovan drug were tried.  The Court found that (1) profits were not warranted in this case, and (2) that even if profits were warranted, plaintiffs failed to show that defendant made any profits from the Trovan drug. As a result of these verdicts, defendant filed several post-trial motions.

First, defendant filed a Renewed Motion for Mistrial.  That motion was fully briefed and taken off-calendar pending the filing of all future post-trial motions by the parties.  On March 15, 2000, defendant filed seven motions for judgment as a matter of law.  The first motion was a Motion for Judgment as a Matter of Law on Plaintiffs' California Common Law Unfair Competition Claim and Their Claim for Punitive Damages or, in the Alternative for a New Trial On These Issues.  The second motion was a Motion for Judgment as a Matter of Law on the Jury's Damage Award on Plaintiffs' Lanham Act Claims or, in the Alternative for a New Trial on the Issue or for a Remittitur.  The third motion was a Motion for Judgment as a Matter of Law on Plaintiffs' Trademark Infringement, Unfair Competition,

-4-

1   False Association or Sponsorship and Fraudulent Business Practices

2   or, in the Alternative for a New Trial.  The fourth motion was a

3   Motion for Judgment as a Matter of Law in Favor of Pfizer Inc. on

4   the Issues of Willfulness Under Federal Law and Malice, Fraud, or

5   Oppression Under State Law or, in the Alternative for a New Trial.

6   The fifth motion was a Motion for Judgment as a Matter of Law on the

7   Jury's Punitive Damage Award or, in the Alternative for a New Trial

8   or Remittitur on the Award.  The sixth motion was a Motion for

9   Judgment as a Matter of Law Based on the Improper Admission of the

10  Jacoby Physician Survey and Accompanying Testimony by Dr. Jacoby.

11  The seventh motion was a Motion for a New Trial on Damages Based on

12  the Erroneous Admission of Trial Testimony by Weston Anson.  On

13  March 30, 2000, defendant also filed two additional motions, a

14  Motion for Clarification of the Court's February 24, 2000 Order and

15  a Motion for Issuance of a Letter of Request for the Production of

16  Documents in the Netherlands Pursuant to the Hague Evidence

17  Convention.  Furthermore, both parties filed a Motion to Re-tax

18  Costs, and plaintiffs filed a Motion for Awards of Attorneys' Fees

19  and Non-Taxable Expenses.

20  **III. LEGAL STANDARD**

21      **A.   Judgment as a Matter of Law**

22      Judgment as a matter of law is proper only if there is no

23  legally sufficient evidentiary basis for a reasonable jury to find

24  for the non-movant with respect to the issue.  Fed. R. Civ. P.

25  50(a)(1).  Thus, "[t]he jury's verdict is reviewed to determine

26  whether it is supported [by] substantial evidence. . . . Substantial

27  evidence is such 'relevant evidence as reasonable minds might accept

28  as adequate to support a conclusion.'"  <u>Mockler v. Multnomah County</u>,

1  140 F.3d 808, 815 n.8 (9th Cir. 1998).

2  **B.   New Trial**

3      The threshold for a new trial is lower than that for a judgment

4  as a matter of law.  A new trial is appropriate where the Court

5  finds that the jury verdict is against the clear weight of the

6  evidence and or was a miscarriage of justice.  See Landes Constr.

7  Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987).

8  The Court has much wider discretion in ruling on a motion for a new

9  trial and may assess the credibility of the witnesses.  See

10  Chronicle Publ'g Co. v. Legrand, 24 U.S.P.Q.2d 1881, 1887 (N.D. Cal.

11  1992) (citing cases).

12  **C.   Remittitur**

13      Where an award of damages is "grossly excessive or monstrous,

14  clearly not supported by the evidence, or only based on speculation

15  or guesswork," Los Angeles Memorial Coliseum Comm'n v. National

16  Football League, 791 F.2d 1356, 1360 (9th Cir. 1986), and gives rise

17  to an inference that "passion and prejudice" tainted the jury's

18  finding of liability, a new trial may be in order.  See,

19  e.g., Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th

20  Cir. 1987).  However, the Ninth Circuit has held that "[w]here there

21  is no evidence that passion and prejudice affected the liability

22  finding, remittitur is an appropriate method of reducing an

23  excessive verdict."  Seymour, 809 F.2d at 1387.

24  **D.   Mistrial**

25      A mistrial is the appropriate remedy for persistent prejudicial

26  attorney misconduct.  See, e.g., Anheuser-Busch, Inc. v. Natural

27  Beverage Distrib., 69 F.3d 337 (9th Cir. 1995).  A mistrial is

28  particularly warranted where "the flavor of misconduct . . .

-6-

1    sufficiently permeates the entire proceeding to provide conviction

2    that the jury was influenced by passion and prejudice in reaching

3    its verdict."  Id. at 346.   In order to determine whether the

4    misconduct of counsel was prejudicial and warrants a new trial, the

5    Court examines, on a case-by-case basis, "the totality of the

6    circumstances, including the nature of the comments, their

7    frequency, their possible relevancy to the real issues before the

8    jury, the manner in which the parties and the court treated the

9    comments, the strength of the case (e.g., whether it is a close

10   case), and the verdict itself."  See City of Cleveland v. Peter

11   Kiewit Sons' Co., 624 F.2d 749, 756 (6th Cir. 1980).

12   **IV.   ANALYSIS**

13       **A.   Defendant's Motion as a Matter of Law on Plaintiffs'**
         **California Common Law Unfair Competition Claim And Their**
14       **Claim For Punitive Damages Or, in The Alternative For a**
         **New Trial on These Issues (Motion No. 1)**

15       The jury awarded plaintiffs $135,000,000 in punitive damages.

16   Punitive damages are not available under the Lanham Act.   Thus,

17   plaintiffs' common law unfair competition claim (the only state

18   claim asserted in this case) must be the predicate for the jury's

19   punitive damage award.   Plaintiffs do not dispute that contention.

20   Consequently, defendant argues that it is entitled to a judgment as

21   a matter of law on the punitive damage claim because: (1) the jury

22   was never (properly) instructed on plaintiff's common law unfair

23   competition claim (thereby removing from the jury the only claim

24   which supports the punitive damage award); and (2) even if the claim

25   was properly before the jury, California unfair competition common

26   law does not recognize claims for reverse confusion, thus plaintiffs

27   are not entitled to monetary damages because they failed to show

28   direct competition among the parties and palming-off (both of which

                                   -7-

1   are a predicate for money damages under current California unfair

2   competition common law).  Plaintiffs challenge each of these claims.

3           **1.    The Common Law Unfair Competition Claim Was Properly
                    Before The Jury**

4           First, plaintiffs argue that the issue of unfair competition

5   was in front of the jury.[3]  Plaintiffs point to Pfizer's proposed

6   jury instruction ten, and ultimately, the Court's final jury

7   instruction eleven which states:

8           In this case, the plaintiffs, Trovan, Ltd. and Electronic
            Identification Devices, Ltd. ("EID"), contend that
9           defendant, Pfizer, Inc. ("Pfizer") has infringed plaintiff
            Trovan, Ltd.'s trademark; that Pfizer's use creates a
10          false impression of association that the plaintiffs
            sponsor Pfizer's product or that Pfizer is affiliated with
11          plaintiffs; and that Pfizer has engaged in unfair
            competition, and fraudulent business practices.  Pfizer
12          denies each of these claims.  The plaintiffs have the
            burden of proving each of their claims by a preponderance
13          of the evidence.

14  (Court's Jury Instruction No. 11, Liability Phase.)[4]

15  ///

16

17  _____

18          [3]     Plaintiffs argue that defendant has waived that objection
    because the Rule 50 trial motion which was brought by Pfizer only
19  addressed plaintiffs' alleged failure to show likelihood of
    confusion, and not the alleged lack of a proper jury instruction.
20  Although defendant agrees that it did not move to dismiss the state
    law claim on those grounds, defendant argues that it had no reason
21  to make such motion at that time.  Based on plaintiffs' proposed
    jury instructions (which did not require the jury to make a finding
22  of "passing off" or "competition"), plaintiffs had already waived
    their right to claim any relief other than injunctive relief on that
23  state claim.  Therefore, defendant had no basis for objecting at
    that point.  Furthermore, it is plaintiffs' burden to prove all the
24  elements of their claim.  Failure to do so cannot be called "invited
    error."
25

26          [4]     Although this instruction references "fraudulent business
27  practices," that claim was not before the jury.  As jury
    instructions 16, 17, and 19 make clear, the only two claims properly
28  before the jury were plaintiffs' Lanham Act infringement claim and
    plaintiffs' California common law unfair competition claim.

                                -8-

1    Furthermore, plaintiffs argue that the jury was instructed on

2    the elements of that common law claim.   Namely, plaintiffs point to

3    the Court's jury instruction seventeen, which states:

4         On plaintiffs' claim for <u>unfair competition</u>, the plaintiff
          has the burden of proving each of the following elements
5         by a preponderance of the evidence:

6         1.   Defendant used the TROVAN mark on or in connection
               with goods;
7
          2.   The use of the TROVAN mark by Pfizer is likely to
8              cause confusion, mistake, or deception, as to:

9              a.   the origin of defendant's goods;
               b.   the affiliation or connection of defendant's
10                  goods with another person; or
               c.   the sponsorship of defendant's goods by another
11                  person.

12        3.   Plaintiffs were or are likely to be damaged by the
               actions of defendant.
13
          If you find that each of these element has been proved,
14        your verdict should be for the plaintiffs on the unfair
          competition claim.   On the other hand, if any of these
15        elements has not been proved, your verdict should be for
          the defendant on the unfair competition claim.
16

17   (Court's Jury Instruction No. 17, Liability Phase (emphasis added)).

18   Thus, in light of the record, it is clear that the issue of common

19   law unfair competition was in front of the jury.

20             2.   **California Unfair Competition Common Law Does Not
                    Recognize Claims For Reverse Confusion Without a**
21             **Showing of Competition**

22        Pfizer further claims that even though the instructions were

23   given, the most they could support is the entry of an injunction, as

24   California law requires a finding of direct competition and passing-

25   off in order to support any award of damages on that claim.   Thus,

26   plaintiffs' failure to seek an instruction on these two elements

27   prevents them from getting an award of damages on that claim, and

28   thus limits their recovery on that state claim to an entry of

                                    -9-

injunctive relief.   Put simply, defendant's argument requires this
Court to answer the following question:   does California require the
showing of (1) competition and (2) palming off in order to support
an award of damages in a common law unfair competition case?   If so,
then a plaintiff cannot recover damages for reverse confusion in
California.[5]   If not, then plaintiffs' common law claim, and its
corresponding verdict, must stand.   The California courts have never
squarely addressed this issue.[6]   Plaintiffs insist, however, that
California common law provides for monetary remedies in cases where
evidence of direct competition and palming-off were lacking.   To
support that assertion, plaintiffs cite to Ojala v. Bohlin, 178 Cal.
App. 2d 292 (1960) and A & M Records, Inc. v. Heilman, 75 Cal. App.
3d 554 (1977).

        In Ojala, the plaintiff conceived and developed the design of
the "Hollywood Fast Draw Holster," which enabled a quicker draw of
one's pistol.   See Ojala, 178 Cal. App. 2d at 296.   After conceiving
of the design, plaintiff entered into an agreement with defendant (a
holster manufacturer) for the manufacture of the design.   See id.
As part of their agreement, defendant promised not to compete with
plaintiff.   See id.   Thereafter, however, defendant started
advertising and selling a holster named "the lightning draw," which

_____

        [5]     That is so because in a reverse confusion case, palming-
off is never an issue, as it is the more well-known actor who
unlawfully uses the mark of a lesser-known actor.

        [6]     However, plaintiffs point out that every other state that
has addressed that issue has recognized reverse confusion as a
viable claim under state law.   Of most import here is the Tenth
Circuit's discussion in Big O Tire Dealers, Inc v. Goodyear Tire &
Rubber Co., 561 F.2d 1365 (10th Cir. 1977).   In that case, the Tenth
Circuit found that the Colorado courts, "if given the opportunity,
would extend its common law trademark infringement actions to
include reverse confusion situations."   Id. at 1372.

-10-

1    was identical to plaintiff's original design and which was
2    advertised in the same publication as plaintiff's product was
3    advertised.  See id.  The court found that defendant was indeed a
4    competitor of plaintiff.  The Court also found, however, that
5    defendant did not attempt to "palm off" plaintiff's goods, as
6    defendant put his own name on the infringing holster.  Nonetheless,
7    even lacking the element of palming off, the court found that
8    plaintiff was entitled to monetary damages.  Recognizing the breadth
9    of the state claim of unfair competition, the court stated that
10   "[t]he scope of unfair competition may not be limited to a
11   particular type of deception" and that "[t]he legal concept of
12   unfair competition has evolved as a broad and flexible doctrine with
13   a capacity for further growth to meet changing conditions, and there
14   is no complete list of the activities which constitute unfair
15   competition."  Id. at 301.  Thus, it concluded that "equity would
16   grant appropriate relief."  Id.

17       In A & M Records, 75 Cal. App. 3d at 554, the defendant
18   advertised and sold pirated copies of records and tape containing
19   plaintiff's copyrighted works.  See id. at 560.  The trial court
20   entered summary judgment in favor of plaintiff on plaintiff's unfair
21   competition claim.  See id. at 564.  On appeal, defendant argued
22   that the trial court erred because the record below failed to show
23   that his conduct constituted palming off (a prerequisite of an
24   unfair competition claim).  The court of appeals affirmed the
25   granting of summary judgment and held that although the plaintiff
26   had not shown palming-off,

27            defendant "ha[d] admitted . . . that without authorization
             he duplicated performances owned by [plaintiff] in order
28           to resell them for profit.  This conduct present[ed] a
             classic example of the unfair business practice of

                                  -11-

1     misappropriation of the valuable efforts of another.  Such
      conduct unquestionably constitutes unfair competition,
2     even if there is no element of "palming off."

3  Id.

4        The facts of Ojala and A & M Records are clearly different from

5  the present facts.  Although the California courts may have

6  recognized a cause of action lacking evidence of palming off, they

7  have done so in the context of competing businesses, i.e., one party

8  was obviously gaining from his use of the other party's "work."

9  Here, plaintiffs have disavowed any claims that Pfizer attempted to

10 capitalize on plaintiffs' mark.  (Tr. 5048.)  Furthermore, as the

11 record indicates, the parties here do not currently compete at all

12 (even though an argument can be made that the parties could

13 potentially compete in the future).

14      Thus, in light of these two cases, the law appears to be

15 clear:  in order to maintain a claim for unfair competition under

16 California law, and in order to recover monetary damages for such

17 claim, a plaintiff need not show palming off.  However, a plaintiff

18 still needs to show competition.[7]  Plaintiffs urge, however, that

19 this Court recognize a claim for reverse confusion under the

20 California common law of unfair competition, even lacking the

21 element of competition.  To support this argument, plaintiffs state

22 that the law of unfair competition "is fluid and encompasses the

23 myriad of forms that unfair competition can take."  (Pls.' Mem. P. &

24 A. Opp'n Motion No. 1 at 9.)

25      At present, "the common law tort of unfair competition is

26 generally thought to be synonymous with the act of 'passing off'

27

28      [7]    Unless plaintiffs only seek injunctive relief.  See Wood
   v. Peffer, 55 Cal. App. 2d 116, 122 (1942).

-12-

1   one's goods as those of another." <u>Bank of the West v. Superior</u>

2   <u>Court</u>, 2 Cal. 4th 1254, 1263 (1992). As explained by the <u>Bank of</u>

3   <u>the West</u> court, "[t]he tort developed as an equitable remedy against

4   the wrongful exploitation of trade names and common law trademarks

5   that were not otherwise entitled to legal protection." <u>Id.</u> (citing

6   1 Callmann, <u>Unfair Competition, Trademarks & Monopolies</u> (4th ed.

7   1981) §§ 2.01-2.03.). The court recognized that the tort also

8   includes "acts analogous to 'passing off,' such as the sale of

9   confusingly similar products, by which a person exploits a

10  competitor's reputation in the market." <u>Id.</u> (citing Rest., Torts,

11  §§ 711-743; 1 Callmann, <u>supra</u>, § 2.04.). However, the court

12  recognized the limitations of that common law remedy by stating that

13  the expansion of legal remedies against deceptive business practices

14  in general occurred not so much through the common law as through

15  the enactment of statutes, particularly the Federal Trade Commission

16  Act. <u>See id.</u> The court noted that "[o]f particular importance was

17  a 1938 amendment to the Act, which expanded the Federal Trade

18  Commission's (FTC) preexisting jurisdiction over "unfair methods of

19  competition" to include "unfair or deceptive acts or practices." 15

20  U.S.C. § 45. This amendment, which became a model for similar state

21  regulatory statutes, gave the FTC jurisdiction over unfair business

22  practices that harmed the public, whether or not such practices also

23  implicated the interests of competitors. <u>See FTC v. Sperry &</u>

24  <u>Hutchinson Co.</u>, 405 U.S. 233, 239-244 (1972).

25      A host of so-called "little FTC Acts" followed, including

26  California's Unfair Business Practices Act. <u>See</u> Cal. Bus. & Prof.

27  Code §§ 17200 et seq.; Civ. Code, former § 3369. The primary

28  purpose of these statutes was to "extend[] to the entire consuming

-13-

public the protection once afforded only to business competitors."
Barquis v. Merchants Collection Assn., 7 Cal. 3d 94, 109 (1972).
The common law tort of unfair competition, which required a showing
of competitive injury, did not provide an effective remedy for
consumers.  See Committee On Children's Television, Inc. v. General
Foods Corp., 35 Cal. 3d 197, 209 (1983); Barquis, 7 Cal. 3d at
109-110.  In contrast, statutory "unfair competition" extends to all
unfair and deceptive business practices.  For this reason, the
statutory definition of "unfair competition" "cannot be equated with
the common law definition . . . ."  Barquis, 7 Cal. 3d at 109
(interpreting Civ. Code, former § 3369)

     The only state law claim before the jury was the California
common law claim for unfair competition.  Although the Court
believes that California courts, if presented with facts analogous
to those in Big O Tires, would recognize a claim for reverse
confusion under its common law, the Court believes it would do so
only if the parties were competitors.  Here, the undisputed evidence
shows that plaintiffs do not currently sell antibiotics, and that
the defendant does not currently sell transponders (or any other
products manufactured by plaintiffs).  Thus, there being no
competition, the Court does not believe that California courts would
allow the recovery of damages for the current claim.  As such,
having found no claim for damages under California law, the entire
award of punitive damages is vacated.

     B.   **Defendant's Motion for Judgment as a Matter of Law on the
          Jury's Damage Award on Plaintiffs' Lanham Act Claims Or,
          in the Alternative for a New Trial on the Issue or for a
          Remittitur (Motion No. 2)**

     This motion addresses the damages awarded under the Lanham Act
only.  In this motion, defendant argues that (1) plaintiffs failed

-14-

1   to show with reasonable certainty that they suffered any damages
2   from defendant's infringement; (2) that the jury's damage award was
3   excessive because it exceeds the value of plaintiffs' mark; (3)
4   that, in the absence of evidence of plaintiff's willingness to
5   license the Trovan mark to Pfizer, an award of reasonable royalty is
6   an inappropriate remedy; (4) that no court has ever awarded a
7   prospective royalty payment; and (5) that an award of both a
8   reasonable royalty and corrective advertising is, in this case,
9   inconsistent and duplicative.[8]

10          **1.   Plaintiffs Showed Sufficient Injury to Award Damages
                    from Pfizer's Infringement**

11
12          At the damage phase of the trial, the jury was instructed on
    the categories of damages that plaintiffs could recover.  (See Jury
13
    Instruction 8, Damages Phase).  That instruction provided that the
14
    jury should consider:
15
16      1.   the injury to the plaintiffs' reputation

17      2.   the injury to plaintiffs' goodwill, including injury to
             the plaintiffs' general business reputation

18      3.   the loss of plaintiff's sales as a result of the
             defendant's infringement
19
        4.   the loss of plaintiffs' profits
20
21      5.   the expense of preventing customers from being deceived

22      6.   the cost of future advertising which is reasonably
             required to correct any public confusion caused by the
23           infringement

        7.   any other factors that bear on plaintiff's actual damages.
24
25   (See Jury Instruction 8, Damage Phase.)  The jury was also
26   instructed to base their award on "evidence and not upon
27
    ────────────────
28       [8]     Because the Court finds that reasonable royalties are
    unavailable in this case, (see infra, Part IV.B.3) the Court shall
    not address the last two arguments.

1    speculation, guesswork, or conjecture." (<u>See</u> Jury Instruction 8,

2    Damage Phase.)

3        In that instruction, items 1 and 2 refer to any damages to

4    plaintiffs' reputation, or in the context of a business entity,

5    plaintiffs' goodwill.  Items 3 and 4 refer to actual monetary losses

6    suffered by plaintiffs.  Items 5 and 6 refer to the amount of

7    corrective advertising plaintiffs would need to expend in order to

8    remedy any damage caused by the confusion.  Finally, item 7 refers

9    to any other kinds of damages the plaintiffs may have proffered.[9]

10       "Trademark remedies are guided by tort law principles." <u>Lindy</u>

11   <u>Pen Co., Inc. v. Bic Pen Corp.</u>, 982 F.2d 1400, 1407 (9th Cir. 1993).

12   In the tort context, damages which result from a tort must be

13   established with "reasonable certainty." <u>See id.</u> (citing Dan B.

14   Dobbs, <u>Remedies</u> § 3.3, at 151 (1973)).  The Supreme Court has held

15   that "[d]amages are not rendered uncertain because they cannot be

16   calculated with absolute exactness," but there must be a reasonable

17   basis for the computation.  <u>Eastman Kodak Co. v. Southern Photo</u>

18   <u>Materials Co.</u>, 273 U.S. 359, 379 (1927).  Thus, the same rationale

19   applies in a trademark case such as this one.  Plaintiffs recognize

20   this much.  As stated in their opposition, "to merit an award of

21   damage, Plaintiffs' proof of harm needs go no further than

22   establishing liability and <u>evidence of some harm</u>, the amount which

23   could be determined under one or more of the several formulations

24   recognized by the courts." (Pls.' Mem. P. & A. Opp'n Motion No. 2 at

25   3 (emphasis added))  Following that very reasoning, and having found

26   little evidentiary support "of some harm," "many courts have denied

27   _____

28       [9]   Plaintiffs here presented no evidence of actual damage
     related to lost or diverted sales.  Thus, the issue shall not be
     discussed here.

1  a monetary award in infringement cases when damages are remote and

2  speculative." Lindy Pen Co., 982 F.2d at 1408 (citing Foxtrap, Inc.

3  v. Foxtrap, Inc., 671 F.2d 636, 642 (D.C. Cir. 1982) ("any award

4  based on plaintiff's damages requires some showing of actual loss");

5  Burndy Corp. v. Teledyne Indus., Inc., 584 F. Supp. 656, 664 (D.C.

6  Conn.) ("no assessment of damages is authorized if it is not based

7  on actually proven damages."), aff'd 748 F.2d 767 (2d Cir. 1984);

8  Invicta Plastics (USA) Ltd. v. Mego Corp., 523 F. Supp. 619, 624

9  (S.D.N.Y. 1981) ("damages will not be awarded in the absence of

10 credible evidence demonstrating injury to the plaintiff from

11 defendant's sales."); Vuitton Et Fils, S.A. v. Crown Handbags, 492

12 F. Supp. 1071, 1077 (S.D.N.Y. 1979) ("The discretionary award of

13 either damages or profits assumes an evidentiary basis on which to

14 rest such an award.  Without such a basis there can be no

15 recovery."), aff'd mem., 622 F.2d 577 (2d Cir. 1980)).

16     Thus, in addressing Pfizer's motion on the issue of actual

17 damages, the Court now turns to the record to determine whether

18 there was an evidentiary basis to support the jury's verdict on the

19 issue of actual damages.  In doing so, the Court must turn to the

20 evidence and determine whether plaintiffs offered proof that their

21 reputation or goodwill was damaged or that they have shown the need

22 for future advertising which is reasonably required to correct any

23 public confusion caused by the infringement.

24          **a.    The Injury to Plaintiff's Reputation or Goodwill**

25     Plaintiffs claim that they are entitled to damages in this case

26 because they have shown injury to their goodwill and reputation.[10]

27 _____

28     [10]    In this case, "goodwill" and "reputation" are
   synonymous.  "Reputation" refers to "[t]he esteem in which a person
                                                      (continued...)

1  Defendant argues, however, that plaintiffs offered no evidence of
2  any damages to their goodwill.  Instead, defendant argues that
3  plaintiffs "suggested that the jury could 'infer the damages' from
4  the 'confus[ion of plaintiffs' mark] with a drug that kills
5  people.'"  (Def.'s Mem. P. & A. Motion No. 2 (quoting Tr. 5227:19-
6  23.))  Claiming that it is improper for the jury to "infer" damage
7  to goodwill from confusion alone, defendant urges this Court to
8  enter judgment as a matter of law on the damages issue.

9      Plaintiffs, on the other hand, argue that they have proven
10  damages because (1) actual confusion damaged plaintiffs' goodwill
11  and (2) plaintiffs' goodwill was further damaged by placing
12  plaintiffs' mark on a harmful drug which had been linked to multiple
13  deaths.  Once that proffer was made, plaintiffs argue that they were
14  entitled to have the jury decide the issue of compensatory damages,
15  including the surrogate damages--namely corrective advertising and
16  reasonable royalties.  On that basis, plaintiffs argue that there is
17  ample evidence to support the jury's $5,000,000 general compensatory
18  damage award and the $3,000,000 reasonable royalty award.

19      However, in their opposition to Pfizer's post-trial motion,
20  plaintiffs cannot point to one instance where direct evidence of
21  actual injury to goodwill or reputation was introduced.  First,
22  plaintiffs introduced no evidence relating to the decrease in value
23  of their goodwill.  Ms. Masin was not allowed to testify as to the
24  relative change in plaintiffs' goodwill because she had no personal
25
26      10    (...continued)
is held by others."  Blacks Law Dictionary (7th ed. 1999) (emphasis
27  added).  Plaintiffs, as business entities, do not have a
"reputation" per se, but rather have "goodwill"--which is defined as
28  a "business's reputation, patronage and other intangible assets that
are considered when appraising the business."  Id.

-18-

knowledge (and therefore no basis as a lay witness) "to support an
opinion that . . . the reputation [of plaintiffs] is not the same as
it was before" the infringement.   (Tr. 5172:2-4.)   On the contrary,
the evidence presented to the jury showed that the sales of EID
products increased by $400,000 after defendant "infringed" its
trademark.   (Tr. 4663:2-20)   Although the increase in sales does not
necessarily indicate an increase in goodwill, it certainly indicates
that plaintiffs' goodwill had not decreased.

Thus, unable to point to direct evidence showing an actual
decrease in goodwill, plaintiffs argue that the jury could infer
damage to goodwill simply because Pfizer "plac[ed] Plaintiffs' mark
on a harmful drug which has been linked to multiple deaths."   (Pls.'
Mem. P. & A. Opp'n Motion No. 2 at 4.)   To support that statement,
plaintiffs cite to transcript pages 4250:5-9, 4480:24 through
4481:5, 4519:16-19, 4523:9-16, 4955:17 through 4959:22, 5173:19-22,
and 5227:19-23.   Plaintiffs incorrectly cite to the record.   Page
4250:5-9, is merely an excerpt of plaintiffs' opening statement,
which is not evidence, and thus is irrelevant here.   Furthermore,
page 5173:19-22 is an excerpt of plaintiffs' closing statement, also
not evidence.   Also, page 5227:19-23 contains an exchange between
the attorneys and the Court outside of the presence of the jury,
which clearly is not evidence.   Some of the other references do not
support anything, much less the assertion that the jury could infer
damage to goodwill simply because Pfizer "plac[ed] Plaintiffs' mark
on a harmful drug which has been linked to multiple death."   For
example, pages 4480:24 through 4481:5 memorializes an exchange
between Ms. Masin, both sides' attorneys, and the Court (in front of
the jury) which states:

1   A. (Ms. Masin):      The telephone communications;
                         secondly, the press releases; and
2                        thirdly, development of the marketing
                         program.  We also had earlier retained
3                        the services of a marketing
                         professional who assisted us with or
4                        assisted me in targeting some of these
                         approaches
5
    Q.   (Mr. Morris):   Now, is that all corrective
6                        advertising?
    A.   Correct
7   Q.   Being —
         MR. LIPPERT: Objection
8        THE COURT:      You are leading the witness.

9
Additionally, the pages referenced by plaintiffs do not even

10
identify the person testifying, or the person asking the question,

11
thereby making it impossible for the court to determine what the

12
evidence is.  (Tr. 4519.)  Presumably, it is Ms. Masin testifying.

13
However, all of Ms. Masin's testimony, including the testimony

14
quoted above, which pertained to corrective advertising only, was

15
stricken from the record.  (Tr. 4959:7-22 (the Court stated that Ms.

16
Masin could not testify as "to any corrective advertising,

17
marketing, public relations, anything as far as corrective

18
advertising goes; advertising, marketing, public relations, whatever

19
label you put on it" and that prior testimony to that effect was

20
"stri[c]ke[n] . . . with regard to a corrective advertising plan."))

21
The other excerpts of record presented by plaintiffs only support

22
defendant's position that plaintiffs have not lost any sales and

23
fail to show that any evidence of damage to goodwill was presented.

24
(Tr. 4523:9-16) (Q. "Do you have any proof that you lost any sales .

25
. ." To that Ms. Masin replied:  "I don't have any proof . . .")

26
Some of the examples support defendant's assertion that there was no

27
admitted evidence of corrective advertising.

28
///

1  Presumably, plaintiffs mis-cited the record and intended to

2  reference another portion of the trial.[11]  However, even assuming

3  that plaintiffs had presented evidence that defendant "plac[ed]

4  Plaintiffs' mark on a harmful drug which has been linked to multiple

5  deaths," and that the jury had made the inference that such act

6  caused a decrease in goodwill, the Court must determine whether such

7  an inference suffices to show "actual injury."

8  Defendant argues that actual damages, such as damages to

9  reputation or goodwill, cannot be inferred, but rather must be

10  supported by actual evidence of injury.  (See Def.'s Mem. P. & A.

11  Motion No. 2 at 10.)  To support that argument, defendant points to

12  Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197 (9th Cir.

13  1989).  In Harper House, plaintiff sued Thomas Nelson, Inc. for,

14  inter alia, false and deceptive advertisements under the Lanham Act.

15  See id. at 208.  The jury found the defendant liable on that claim

16  and awarded plaintiff $1,860,307.  See id. at 201.  The defendant

17  brought a motion for judgment notwithstanding the verdict on that

18  claim.  In denying the motion, the district court found that the

19  "jury could reasonably find that plaintiff was injured."  Id. at

20  209.  However, the district court did not refer to any proof of

21  injury, but rather relied on a presumption "that a plaintiff's

22  damages equal the amount of money spent by defendants on

23  advertising."  Id. at 209.  The Ninth Circuit reversed the district

24  court's denial of the motion.  It held that although the amount of

25  money spent on advertising may constitute a proper basis for the

26  amount of damages eventually awarded to a plaintiff, it cannot form

27

28  [11]  See Tr. 1762 (memorializing Ms. Benefiel's testimony stating that she saw the headline "Trovan kills.")

-21-

1  the basis for "the fact of injury." See id. (holding that courts
2  must "distinguish between the amount of proof needed to show that
3  some damages were the certain result of a section 43(a) violation
4  and the amount of proof needed to ascertain the exact amount of
5  damages."). Thus, following that reasoning, plaintiffs here must
6  point to some evidence showing that "some damages were the certain
7  result" of defendant's infringement.[12]

8     Here, plaintiffs assert that their reputation was damaged by
9  the acts of the defendant. That is the harm which, they claim,
10 forms the basis of the damage award. Thus, the Court now turns to
11 the record to determine whether plaintiffs have presented any

12

13    [12]   Although the above-cited case stands for the broad
   proposition that a damage award must be supported by "factual
14 injury," the facts of Harper House are sufficiently different from
   the instant case to warrant distinction. In Harper House, the
15 plaintiffs did not allege that the defendant's product caused any
   negative impact on plaintiff's product. Rather, the plaintiffs
16 asserted that the consuming public was injured by the deceptive
   advertising, but yet it was the plaintiff who sought damages. That
17 is not the case here. The plaintiffs here do claim actual injury to
   their goodwill.
18    To further support its argument, defendant also cites Web
   Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202 (7th Cir.
19 1990). That case, although not binding precedent, reinforces the
   broader principle enunciated in Harper House. In Web Printing, the
20 Seventh Circuit clearly distinguished between the burden a plaintiff
   has on proving injury in order to win a liability verdict, and the
21 burden a plaintiff has on proving injury when seeking monetary
   damages under the Lanham Act. See id. Addressing a plaintiff's
22 burden when seeking monetary damages under the Lanham Act, the court
   held that "a higher standard of proof is required [than to show
23 liability only]" and that a "plaintiff wishing to recover damages
   for a violation of the Lanham Act must prove (1) the defendant's
24 Lanham Act violation, (2) that the violation caused actual confusion
   among consumers of the plaintiff's product, and (3) that as a
25 result, the plaintiff suffered actual injury, i.e., a loss of sales,
   profits, or present value (goodwill)." Id. at 1205. Under that
26 standard, defendant argues that plaintiffs have failed to offer
   evidence that it suffered actual injury to its goodwill. Thus,
27 defendant argues plaintiffs may not recover damages.

                              -22-

1   evidence relating to actual injury to their reputation.   Plaintiffs

2   cite to pages 2557-2563, 1761-1763 of the trial transcript, and

3   trial exhibits 2112 and 2131.   Pages 2557 through 2563 memorialize

4   an exchange between Dr. Buffam (a veterinarian) and Ms. Dwight, one

5   of plaintiffs' attorneys.   Although Dr. Buffam testified that he was

6   "confused," he disavowed any confusion as to source.   (Tr. 2561.)

7   Rather, he testified that he did not think that an advertisement for

8   Pfizer's Trovan was "referring to Mr. Masin's product."   (Tr. 2561.)

9   Apparently, what this witness was confused about was "why

10  [defendant] named [its product] Trovan?"   (Tr. 2561.)   Confusion as

11  to one's business decision does not constitute confusion as to

12  source.   However, even more relevant to the instant inquiry, this

13  witness's testimony does not provide any evidence of injury to

14  goodwill.   On the contrary, this witness knew that Mr. Masin had a

15  registered trademark in the name Trovan.   (Tr. 2561.)   Thus, there

16  is no chance that this witness thought that it was plaintiffs who

17  were possibly infringing on Pfizer's trademark.[13]

18       Transcript pages 1761 through 1763 memorialize the testimony of

19  Ms. Benefiel.   Additionally, trial exhibit 2112 is an e-mail written

20  by Ms. Benefiel to InfoPET.   The e-mail states that Ms. Benefiel had

21  just read about the dangers of Pfizer's Trovan (namely that it was

22  causing deaths) and wanted to know whether that was the same product

23  which was implanted in her cat.   (See Trial Ex. 2112.)   Although her

24  testimony and her e-mail may show that she may have been confused as

25  to the source of the products, it does not provide any evidence that

26

27       [13]   The belief that a senior user is the infringer could
    constitute injury to goodwill, as it would make the senior user look
28  as if it was trying to palm off its goods on the junior user's well
    known name.

1  plaintiffs' goodwill was damaged.  She never testified as to what
2  she thought of plaintiffs' reputation before, or after, she read the
3  article in the paper.  She did not testify that, because of this
4  article, she refrained from purchasing any of plaintiffs' products.
5  She did not testify that she advised her friends or colleagues not
6  to purchase plaintiffs' product.  In spite of this lack of evidence,
7  plaintiffs urge this Court to ratify the jury's presumption of
8  injury.

9      There are no reported cases in this jurisdiction which analyze
10  the degree of proof required to show injury to reputation in the
11  trademark context.  However, such analysis has been undertaken in
12  the context of defamation.  Defamation is an invasion of the
13  interest in reputation.  See 5 Witkin, Summary of California Law,
14  Torts § 471 (1988).  It may be libel or slander.  See id.  Some
15  types of defamatory statements, such as the charge of a serious
16  crime, "would be damaging in the minds of everyone."  Id.  However,
17  other types of defamatory statements may only be defamatory if they
18  have a tendency to injure the reputation among members of some
19  substantial group of persons.  See id. at § 474 (citing Rest. 2d,
20  Torts, Comment e.)  Of course, a corporation may be defamed by
21  "matter which has a tendency to injure its business reputation, as
22  by deterring persons from dealing with it."  Id. (citing Western
23  Broad. Co. v. Times-Mirror Co., 14 Cal. App. 2d 120, 124 (1936)).

24      Within each category of defamation (libel and slander), the
25  courts, followed by the legislature, have devised a two tier system
26  of remedies.  If the defamatory statement is libel per se (meaning
27  that the statement is defamatory on its face, without the need for
28  explanatory matter such as surrounding circumstances, inducement,

-24-

1  innuendo, or other extrinsic fact to make its meaning clear), then

2  damages may be inferred. See 5 Witkin, supra, § 481. Similarly, if

3  the defamatory statement is slander per se,[14] the plaintiff also

4  need not allege or prove special damages. See id. 490. The reason

5  for that rule is that statements which are libel per se or slander

6  per se are so bad, that damages are inferred. However, if the

7  defamation is not libel per se or slander per se, then a plaintiff

8  must prove special damages.

9      This analogy, although imperfect, sheds some light as to the

10  degree of proof plaintiffs should provide in order to show actual

11  injury. If the "bad publicity" caused by Pfizer's Trovan's side

12  effects is of such nature that it would "directly . . .  injure

13  [plaintiff] in respect to [its] . . . trade or business . . . by

14  imputing something with reference to [its] . . . business that has a

15  natural tendency to lessen its profits" then a presumption of injury

16  should be sufficient to find actual injury. Cal. Civ. Code § 46.

17  Certainly, if those statements were made in the context of a

18  defamation cause of action,[15] the plaintiff in that case would

19  certainly need not make a showing of special damages.

20

21     [14]   Most relevant here is California Civil Code Section 46,
which provides that slander is "a false and unprivileged

22  publication, orally uttered . . . which:  (3) Tends directly to
injure [a plaintiff] in respect to his office, profession, trade or

23  business, either by imputing to him general disqualification in
those respects which the office or other occupation peculiarly

24  requires, or by imputing something with reference to his office,
profession, trade, or business that has a natural tendency to lessen

25  its profits . . . ." Cal. Civ. Code § 46.

26     [15]   For example, if Pfizer had brought a defamation cause of
action against a defendant for making false statements regarding

27  deadly side effects of its drug Trovan, injury would certainly be
presumed, as those statements would be considered libel per se or

28  slander per se. The result should be no different here if there is
confusion as to source.

1    Therefore, upon hearing that the drug Trovan was responsible
2 for one or more deaths, plaintiffs' customers (if they are confused
3 about the origin of plaintiff's product) are almost certainly not
4 going to look favorably on plaintiff's product.  Thus, the negative
5 publicity is bound to have a tendency to lessen plaintiff's profits.
6 As such, the inference that the jury may have made relating to
7 actual harm to plaintiff's goodwill is permissible here as well.
8 Because it is permissible, and reasonable, plaintiffs have shown
9 sufficient injury to warrant an award of damages.

10              **b.   Corrective advertising**

11    Plaintiffs then claim that they have made a sufficient showing
12 that they are entitled to corrective advertising.  However, all of
13 the evidence relating to corrective advertising was stricken from
14 the record, and thus, not before the jury.   Nancy Budd's report on
15 corrective advertising, and any testimony related to that report,
16 was excluded.  (Tr. 40).  Furthermore, the only other testimony
17 which could support an award of corrective advertising was Ms.
18 Masin's.  All of that testimony, however, was stricken from the
19 record.  (Tr. 4959:7-22) (the Court stated that Ms. Masin could not
20 testify as "to any corrective advertising, marketing, public
21 relations, anything as far as corrective advertising goes;
22 advertising, marketing, public relations, whatever label you put on
23 it" and that prior testimony to that effect was "stri[c]ke[n] . . .
24 with regard to a corrective advertising plan.").  Thus, plaintiffs
25 have failed to present any evidence to support a corrective
26 advertising award.[16]

27

28   [16]   At oral argument on this motion, plaintiffs stated that
the jury could have awarded the proper amount of corrective
(continued...)

-26-

### 2. The Jury's Damage Award Is Excessive Because it Exceeds the Value of Plaintiffs' Mark

Defendant next argues that even if plaintiffs are entitled to damages, the $5,000,000 general damage award is excessive because it exceeds the value of plaintiffs' mark. Consequently, defendant asks this Court to remit the amount of damages not to exceed the reasonable value of plaintiffs' mark, or in the alternative, to order a new trial.

#### a. Standard on Remittitur

A reviewing court should uphold a jury's award of damages unless that award is based on speculation or guesswork. See City of Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1371 (9th Cir. 1992).

> Trademark remedies are guided by tort law principles. As a general rule, damages which result from a tort must be established with reasonable certainty. . . . Many courts have denied a monetary award in infringement cases when damages are remote and speculative.

Lindy Pen Co., 982 F.2d at 1407-08.

#### b. Analysis

##### i. Was the Amount of Damages Excessive?

An award of damages in a trademark case is intended to compensate a plaintiff for any harm suffered. See 15 U.S.C. § 1117(a). Defendant argues that here, plaintiffs were overcompensated because the award of general damages far exceeds the value of their mark. As Professor McCarthy wrote,

---

[16]      (...continued)
advertising solely based on the amount of money Pfizer spent in advertising the Trovan drug. Plaintiffs err. Lacking any evidence whatsoever of a reasonable basis upon which to compute the proper amount of corrective advertising, the jury's determination (if solely based on Pfizer's own advertising budget) can only be speculative, and thus improper.

> There is something basically unseemly and grossly
> uneconomical in an award to a small company of an amount
> of money several times its net worth to use to resuscitate
> an infringed trademark.  When such an award is many times
> the value of the trademark property, then it appears that
> plaintiff has received a windfall, not compensation.

J. Thomas McCarthy, 5 McCarthy on Trademark § 30:84 (5th ed. 1999).

Case law seems to support that statement.  See Adray v. Adry-Mart, Inc., 76 F.3d 984, 989 (9th Cir. 1995); Zazu Designs v. L'Oreal S.A., 979 F.2d 499, 506 (7th Cir. 1992).  However, both cases (as well as professor McCarthy's comment) address damages based on corrective advertising.[17]

Nonetheless, there is no reason why that same rationale should not apply in the context of loss of goodwill (which is the only remaining basis for plaintiffs' general damage award).  The purpose of compensatory damages in tort cases (as well as trademark cases) is to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred.  See Freeport Sulphur Co. v. The S.S. Hermosa, 526 F.2d 300, 304 (5th Cir. 1976) (citing C. McCormick, Damages 560 (1935)).  Also, in the context of tangible property torts, when there is a tortious injury to property and the market value of that property is unknown, the amount of damages must be determined by the cost of repairs to the property.  See id. (citing D. Dobbs, Law of Remedies 392 (1973); F. Harper & F. James, The Law of Torts 1311-12 (1956)).  These two principles are in apparent conflict, however, when the repairs that

---

[17]     Furthermore, in Adray, the Ninth Circuit reversed the corrective advertising award partly because the jury was not instructed on that very issue.  Here, the jury did receive that instruction.  (See Jury Instruction No. 8, Damage Phase.) Additionally, the language in Zazu is merely dicta.  The Court had already decided that the plaintiff had failed to show liability. Nonetheless, the Court finds this authority instructive.

1   are necessary to correct the damage caused by whatever tort enhance

2   the pre-tort value of the plaintiff's property.  See id.  In such a

3   case, the increase in value should be deducted from the plaintiff's

4   recovery for the "cost of repairs."  Id.

5        Adopting this principle here, it is irrelevant whether

6   plaintiffs were awarded damages under the corrective advertising or

7   loss of goodwill theory.  In either case, the damages awarded were

8   to "repair" plaintiffs' reputation.  Thus, the amount of "repair"

9   cannot exceed the value of the thing being repaired--namely,

10  plaintiffs' mark and its underlying goodwill.[18]

11       Here, defendant argues that plaintiffs' mark was not worth

12  $5,000,000 (much less the $8,000,000 total compensatory damage

13  award).  Rather, defendant argues that the undisputed evidence shows

14  that (1) plaintiff EID purchased in 1990 for $500,000 the exclusive

15  license in perpetuity for the use of the Trovan mark (and the

16  underlying technology) (Trial Ex. 1145; Tr. at 1266:2-1267:6); (2)

17  the sale of the implantable transponder upon which plaintiffs

18  predicate their claim of infringement has been permanently enjoined

19  (Tr. 552:3-9; 2792:8-11); (3) EID at best has been marginally

20  profitable (Tr. at 4486:4-5); (4) Plaintiff Trovan Ltd. maintains no

21  profit or loss statements (Tr. 5115:8-11); and (5) plaintiffs have

22  undertaken no corrective advertising (Tr. 4598:24-4599:5; 4657:13-

23  19; 5093:17-5097:22).  Thus, defendant argues that the award was

24  excessive as a matter of law and, as such, that the Court should

25

26  _____

27       [18]    As the court noted in Zazu Designs, "[e]xpenses for
    repairs cannot be justified when they exceed the value of the asset.
28  If a car worth $4,000 is crushed in a collision and repair would
    cost $10,000, the court awards damages of $4,000, not $10,000."
    Zazu Designs, 979 F.2d at 506.

1  remit the award to an amount not to exceed the reasonable value of

2  plaintiffs' mark, an amount not in excess of $500,000.  In the

3  alternative, defendant requests that the Court vacate the jury's

4  general damage award and order a new trial.

5      Plaintiffs argue, however, that the jury's verdict did not

6  exceed the value of the mark.  Although the mark may have been

7  purchased for $500,000 back in 1990, the plaintiffs argue that the

8  mark appreciated in value due to (1) substantial evidence of actual

9  use and marketing of the mark (Tr. 485);[19] (2) Internet marketing

10  (Tr. 1010:23);[20] and (3) the "enormous potential for the mark in

11  presentations for further exploitation[21] . . . from which the jury

12  may well have concluded that the value at the time of the

13

14      [19]    Page 485 of the trial transcript does not provide any
evidence of either marketing or use of the mark, much less

15  "substantial evidence."  Furthermore, the discussion in the
transcript refers to InfoPET, and not plaintiffs' business.

16      [20]    Trovan's website is "the primary tool at the present
time for marketing of Trovan's product worldwide and in the United

17  States."  (Tr. 1010:23-25.)

18      [21]    In order to support its argument that the mark has
"enormous potential," plaintiffs cite to pages 877 through 878, 971

19  through 972, 980 through 981, 1046, 1048, and 2294 through 2295 of
the trial transcript.  Pages 877 through 878 address "potential"

20  applications of the plaintiffs' stationary reader, pages 971 through
972 describe the current use of the ID-100 transponder in pets and

21  fishes, pages 980 through 981 address how the Trovan transponder has
been used in tracking oxygen gas bottles and surgical clothing,

22  pages 1046 and 1048 address how zoos and cities use the transponder
to track animals, and finally, pages 2294 through 2295 describe an

23  exchange between the Court and both side's attorneys, outside the
presence of the jury.

24      That evidence, however, gives little indication as to the value

25  of plaintiffs' mark.  In part, these statements are evidence of
things plaintiffs intended to do with their mark (potential uses).

26  Such potential uses, or future applications of the mark, although
relevant to show likelihood of confusion (expansion of the product

27  line), are purely speculative and cannot form the basis of a damage

28  award.  See McClaran v. Plastic Indus., 97 F.3d 347, 361 (9th Cir.
1996).

-30-

infringement exceeded the value at acquisition." (Mem. P. & A. Opp'n Motion No. 2 at 17.) Furthermore, plaintiffs argue that the jury was instructed on that very issue and that at this stage, the Court may not assume that the jury failed to follow the Court's instruction. The plaintiffs seem to concede that the amount of damages is somewhat uncertain, however they argue that any uncertainty in the amount of damage should be borne by the defendant. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265 (1946).[22]

None of that evidence, however, supports the magnitude of the general damages ($5,000,000) awarded by the jury. To the contrary, the evidence introduced at trial shows that, other than the $500,000 spent by EID to acquire the exclusive right of the Trovan mark and its underlying technology, there is no direct evidence of the value of plaintiffs' goodwill prior to the infringement. Nor is there any direct evidence that the value of plaintiffs' goodwill increased between the time it acquired the mark and the time just before the infringement began. On the contrary, the evidence shows that plaintiffs were enjoined from selling one of their products—namely, the implantable transponder—which indicates a decrease in goodwill. (See 552:3-9; 2792:8-11.). Furthermore, the evidence showed that EID was, at best, a marginally profitable business, which also

---

[22]    Although plaintiffs are correct in their assertion, the courts have also held that "people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992). "Allowance for certainty is one thing . . . and rank speculation is another." Zazu Designs, 979 F.2d at 505.

1  indicates a reduction in goodwill. (Tr. 4486:4-5.)[23]  This evidence

2  supports the conclusion that the value of plaintiffs' goodwill just

3  prior to the time of infringement was less than the value of

4  plaintiffs' goodwill at the time it purchased the rights to the

5  mark.

6        Taking all the inferences in favor of plaintiffs, however, the

7  value of plaintiffs' goodwill at the time of infringement cannot,

8  based on the undisputed evidence in the record, exceed $500,000.

9  Thus, (1) having previously found that the jury could have found

10 damage to plaintiffs' goodwill based on the negative publicity about

11 Pfizer's Trovan, (2) that such damage could have, in the light most

12 favorable to plaintiffs, destroyed the entire value of the goodwill,

13 and (3) based on the fact that a trademark cannot be worth less than

14 zero,[24] the most the jury could have awarded plaintiffs on their

15 general damage claim, according to the evidence, was $500,000.

16 Thus, the $5,000,000 award was excessive as a matter of law.

17                         **ii.  Remedies**

18      If a court determines that the evidence supported the "fact of

19 injury" (as it did here) but the losing party challenges the size of

20 the award on the basis of prejudice, (and the court finds that such

21 prejudice existed) that court's discretion is somewhat limited.   In

22 such a case, the Ninth Circuit has held that:

23        When the court, after viewing the evidence concerning
          damages in a light most favorable to the prevailing party,
24        determines that the damages award is excessive, it has two
          alternatives. It may grant defendant's motion for a new

25

26        [23]    The profit-making ability of EID is relevant here, as
27 "goodwill" refers to a business's "ability to earn income in excess
   of the income that would be expected from the business viewed as a
28 mere collection of assets."  Black's Law Dictionary (7th ed. 1999).

        [24]    See Zazu Designs, 979 F.2d at 506.

                               -32-

1    trial or deny the motion conditional upon the prevailing
     party accepting a remittitur.  The prevailing party is
2    given the option of either submitting to a new trial or of
     accepting a reduced amount of damage which the court
3    considers justified.

4    Fenner v. Dependable Trucking Co., 716 F.2d 598, 603 (9th Cir.1983)

5    (citing Linn v. United Plant Guard Workers, 383 U.S. 53, 65-66

6    (1966)).

7         Accordingly, the Court remits the amount of general damages to

8    $500,000.  Plaintiffs therefore have the option of accepting this

9    amount.  Should plaintiffs refuse the remitted amount, the Court

10   finds that the jury verdict on the issue of general damages is

11   against the clear weight of the evidence, was a miscarriage of

12   justice, and the Court, thus, orders a new trial.

13            3.    The Ninth Circuit Does Not Recognize Reasonable
                    Royalties as a Measure of Damages Where There Is No
14                  Evidence That a Party Intended to License Their
                    Trademark[25]

15        Defendant argues that "[n]o reported opinion by any court in

16   the Ninth Circuit has awarded any trademark infringement plaintiff

17   damages based on a hypothetical royalty rate."  (Def.'s Mem. P. & A.

18   Motion No. 2 at 16.)  Plaintiffs concur with that statement and

19   further state that "[a] reasonable royalty award is, by its very

20   nature, hypothetical.  Evidence is presented as to what the parties

21   might have agreed in a theoretical licensing negotiation that never

22   took place."  (Pls.' Mem. P. & A. Opp'n Motion No. 2 at 9 (emphasis

23

24   _____

        [25]    Plaintiffs argue that Pfizer should not be allowed to
25   argue that a reasonable royalty is "fundamentally not a legitimate
     measure of damages" because it failed to do so at trial.  Plaintiffs
26   argue that Pfizer's objection at trial only stated that a reasonable
     royalty was inappropriate unless there was a showing of bad faith.
27   (See Pls.' Mem. P. & A. Opp'n Motion No. 2 at 7 n.4.).  Plaintiffs
     err.  Pfizer did object to the appropriateness of a reasonable
28   royalty as a measure of damages when there is no evidence of an
     intent to license.  (See Pagac Decl., Ex. 3 at 383.)

                              -33-

1   in original).)  Plaintiffs argue, however, that "there is no basis

2   on which to conclude the Circuit would not accept this form of

3   relief." (Pls.' Mem. P. & A. Opp'n Motion No. 2 at 7.)  Plaintiffs

4   further argue that this Circuit's recognition of other measures of

5   surrogate damages (mainly corrective advertising) indicates that it

6   would recognize a reasonable royalty as an appropriate form of

7   damages in trademark infringement cases.  Thus, plaintiffs urge this

8   Court to recognize such measure of damages here.

9       It is true that some circuits have allowed an award of

10  reasonable royalties in trademark infringement cases.  See, e.g.,

11  Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 963 (7th

12  Cir. 1992), remanded and affirmed, 34 F.3d 1340 (7th Cir. 1994);

13  Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1519 (11th Cir. 1990);

14  Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., 597 F.2d 71,

15  75-76 (5th Cir. 1979).  However, in all of those cases (save one),

16  the Court has recognized that such damages were appropriate when the

17  parties had shown a willingness to license the mark.  See Howard

18  Johnson, 892 F.2d at 1519; Boston Prof'l Hockey Ass'n, 597 F.2d at

19  75-76.  The only circuit which has allowed the award of a reasonable

20  royalty in spite of no evidence of a prior licensing relationship is

21  Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 963 (7th

22  Cir. 1992) (Sands I), remanded and affirmed, 34 F.3d 1340 (7th Cir.

23  1994) (Sands II).

24      In Sands I, the holder of the registered trademark "Thirst-Aid"

25  sued Quaker Oats Company for infringement based on their advertising

26  slogan for the drink Gatorade.  See Sands I, 978 F.2d at 949-51.

27  The district court held a bench trial and found infringement.  See

28  id.  As a result, the court awarded monetary damages and injunctive

-34-

relief.  See id.  Of relevance here, the court awarded plaintiff ten
percent of defendant's pre-tax profit on Gatorade for the period
during which Quaker used "Thirst Aid" in its advertising.  See id.
at 951.  It did, however, refuse to award damages for corrective
advertising, as it found that plaintiff had not made concurrent use
of the Thirst-Aid mark, [thus] there was no need to counteract
Quaker's advertising."  Sands II, 34 F.3d at 1343.  The Seventh
Circuit affirmed the district court's liability decision and the
granting of the injunction, but remanded the case for a more precise
determination of the monetary damages.  See Sands I, 978 F.2d at
963.  On remand, the district court was to recalculate the award of
damages in accordance with the following principles:

> (1) the court may not simply award [plaintiff] a
> percentage of Quaker's profits; (2) the court should use a
> reasonable royalty as a baseline or starting point for
> determining the appropriate award; (3) in determining the
> appropriate award, the court may take into account the
> possible need for deterrence, which may involve
> consideration of the amount of Quaker's profits.

Id. n.19.

On remand, the district court recalculated the amount of
damages using a reasonable royalty.  See Sands II, 34 F.3d at 1346.
The court also increased that award pursuant to 15 U.S.C. § 1117(a).
In doing so, the district court found that "the imposition of a
hypothetical licensing royalty [would not] deter predatory conduct
such as defendant's."  Sands II, 34 F.3d at 1346.  Ultimately,
however, the Seventh Circuit upheld the damage calculation based on
the reasonable royalty, but remanded the case for further
proceedings so that the district court could state with more
precision the basis for the enhancement.  See id. at 1352.

///

-35-

1    Sands I and Sands II, however, are not binding precedent on

2    this Court.  Furthermore, these opinions' persuasiveness relating to

3    this very issue (reasonable royalty) is undermined by the peculiar

4    facts involved in that case.  First, Sands I used unjust enrichment

5    as an underlying justification of the award of reasonable royalty,

6    which tends to take the matter away from the jury and into the hands

7    of the Court.  See Sands I, 978 F.2d at 963 ("A reasonable royalty,

8    perhaps related in some way to the fee [plaintiff] was paid by

9    [another party previously for the use of the mark] would more

10   accurately reflect both the extent of Quaker's unjust enrichment . .

11   . .").  Second, the "reasonable royalty" to be determined by the

12   district court in Sands I was only to serve as "a baseline or

13   starting point for determining the proper award."  Id. at 963 n.8.

14   This contention reinforces the point previously made--that the award

15   was equitable in nature, and thus outside the province of the jury.

16   Finally, in Sands I, the court had evidence that plaintiff had

17   previously licensed its name to another company.  See id.  Indeed,

18   it suggested that the district court use a royalty "related in some

19   way" to the royalty that plaintiff had demanded for others to use

20   its mark.  See id. at 963.  This fact is glaringly absent in the

21   current case.[26]  For those reasons, the Court finds that neither

22   Sands I or Sands II provide a persuasive framework for this Court to

23   follow.  As such, the Court refuses to follow this precedent here.

24       Lacking any direction, the Court is obligated to address this

25   matter as a matter of first impression.  In doing so, the Court

26   relies on the aforementioned principle that a reviewing court should

27

28       [26]    Rather, here, plaintiffs have demonstrated an
     unwillingness to license their name.  (Tr. 1091:1-1095:10; 1335:1-
     1336:7.)

1   uphold a jury's award of damages unless that award is based on

2   speculation or guesswork.  See City of Vernon, 955 F.2d at 1371.

3   As discussed above,

4        Trademark remedies are guided by tort law principles.  As
         a general rule, damages which result from a tort must be
5        established with reasonable certainty. . . . Many courts
         have denied a monetary award in infringement cases when
6        damages are remote and speculative.

7   Lindy Pen Co., 982 F.2d at 1407-08.

8        This principle is a fundamental tenet of tort law.  As such, it

9   has been applied by California courts in the context of lost

10  profits.  Lost profits analysis is relevant here, because reasonable

11  royalties, by nature, are a subgroup of lost profits.  After all, a

12  reasonable royalty is the money the plaintiff would have made if the

13  defendant had obtained a license.  In California, "in order to

14  support a lost profits award the evidence must show 'with reasonable

15  certainty both their occurrence and the extent thereof.'"

16  Sanchez-Corea v. Bank of Am. 38 Cal. 3d 892, 907 (1985) (emphasis

17  deleted).  Damages for loss of profits are often denied to an

18  "unestablished" or new business because they are too uncertain and

19  speculative if they cannot be calculated with reasonable certainty.

20  See S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp., 58

21  Cal. App. 3d 173, 184-185 (1976).  "The ultimate test is whether

22  there has been 'operating experience sufficient to permit a

23  reasonable estimate of probable income and expense,' or, in other

24  words, whether 'anticipated profits dependent upon future events are

25  allowed where their nature and occurrence can be shown by evidence

26  of reasonable reliability.'"  Edwards v. Container Kraft Carton &

27  Paper Supply Co., 161 Cal. App. 2d 752, 760 (1958) (quoting Natural

28  Soda Prods. Co. v. City of L.A., 23 Cal. 2d 193, 199 (1943); Grupe

-37-

1 | v. Glick, 26 Cal. 2d 680, 693 (1945), respectively).

2 | There is no question that an award of reasonable royalty,

3 | lacking any previous negotiations among the parties

> rests on a legal fiction.  Created in an effort to
> "compensate" when profits are not provable, the
> "reasonable royalty" device conjures a "willing" licensor
> and licensee, who like Ghosts of Christmas Past, are dimly
> seen as "negotiating" a "license."  There is, of course,
> no actual willingness on either side, and no license to do
> anything . . . .

Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 1159 (6th Cir. 1978).  Lacking any evidence that plaintiffs in this case would have licensed the rights to the mark, the award of reasonable royalties has no basis in reality, much less any basis in fact. Thus, it cannot be said to have been made "with reasonable certainty."  Sanchez-Corea, 38 Cal. 3d at 907.  Thus, the jury's reasonable royalty award is vacated.[27]

> **C.   Defendant's Motion For Judgment as a Matter of Law on Plaintiffs' Trademark Infringement, Unfair Competition, False Association or Sponsorship And Fraudulent Business Practices Or, in The Alternative For a New Trial (Motion No. 3)**

In its third motion for judgment as a matter of law, defendant argues that plaintiffs (1) failed to show that the products were related, (2) failed to establish a likelihood of confusion, and (3) even if the plaintiffs did show likelihood of confusion, the Court should grant a new trial because such finding of confusion was

---

[27]   In the alternative, Pfizer argued that the testimony of Weston Anson (which was the only testimony elicited regarding royalty rates) should have been stricken, thereby resulting in a judgment as a matter of law in favor of Pfizer on that issue. Pfizer makes this argument in its seventh motion for judgment as a matter of law.  (See Motion No. 7.)  That motion is denied.  Mr. Anson's testimony, although severely damaged by defendant's cross-examination, is admissible and the flaws pointed out by defendant merely go to weight.

-38-

tainted by the admission of the fraudulent letters.[28]   In a case of

reverse confusion, the plaintiff must still show likelihood of

confusion.   In order to do so, the plaintiff is bound by the same

factors used in cases of forward confusion.   That contention has

been undeniably confirmed by Judge Kozinski's opinion in Dreamwerks,

and the parties do not dispute it here.

### 1.   Relatedness of The Goods

In its February 24, 1999 Order Denying Summary Judgment, the

Court found that "a jury could find that the parties' lines of goods

are sufficiently related that consumers doing business with the

senior users, Trovan and EID, might mistakenly believe that they are

dealing with the junior user, Pfizer."   (See Feb. 24, 1999 Order at

23.)   Thus, the Court could not "find that the parties' goods are

unrelated as a matter of law."   (See Feb. 24, 1999 Order.)   Those

findings of relatedness were partly predicated on Trovan and EID's

"Zip Quill," which is, according to plaintiffs, "a system which

allows the implantation of a pharmaceutical . . . into animals and

human beings."   (See Feb. 24 Order at 24.)

///

_____

[28]   On several occasions, defendant states that if the
argument presented does not convince the Court that it is entitled
to a judgment as a matter of law, it is entitled to a new trial
because of some error.   Specifically, defendant argues that a new
trial is warranted because (1) the jury was not instructed that if
it found that the parties' respective products were totally
unrelated, they had to find in favor of Pfizer; (2) the jury was not
instructed that a few isolated incidents of confusion are not
sufficient to show actual confusion; (3) the jury was not instructed
that they could not consider "general confusion," but rather must
focus on reverse confusion, and thus the jury could have based its
entire liability verdict on Ms. Benefiel's general confusion.   These
arguments lack merit.   The jury was properly instructed on the
appropriate Sleekcraft factors, and presumably followed the
instruction in rendering its verdict.

1    It is true that where the nature of the goods is undisputed,

2  the relatedness of the goods is a matter of law.  See J.B. Williams

3  Co. v. Le ContEe Cosmetics, Inc., 523 F.2d 187, 190-93 (9th Cir.

4  1975).  It is also true that where the products are totally

5  unrelated, there can be no confusion as a matter of law.  See

6  Dreamwerks Production Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th

7  Cir. 1998).  Defendant argues here that the evidence adduced at

8  trial negates any finding of relatedness,[29] and thus it is entitled

9  to a judgment as a matter of law.  As the Court ruled above, the

10  evidence on the record is sufficient to support a finding that

11  plaintiffs' and defendant's "Trovan" products are sufficiently

12  related, or that there is at least sufficient disputed facts as to

13  each product's application, to allow the claim to go to the jury.

14  As such, the Court finds that the products are not so unrelated as

15  to warrant judgment as a matter of law.

16         **2.   Likelihood of Confusion**

17     Although the evidence may show that the products were slightly

18  related, relatedness is not the cornerstone of trademark

19  infringement.  Rather, the jury must decide whether there is

20  likelihood of confusion.  In forward confusion cases, the test for

21  likelihood of confusion is whether a "reasonably prudent consumer"

22  is likely to be confused as to the origin of the good or service

23

24         [29]    Namely, defendant argues that the evidence showed that
25  (1) plaintiffs only recently started distributing the Trovan Zip
    Quill which contains small amounts of amoxycillin to prevent
26  infection from the injection of the transponder into animals; (2)
    that the Zip Quill has never been marketed or sold for use in
27  humans; and (3) that in contrast, Pfizer's Trovan is only used by
    human beings.
28

-40-

1  bearing one of the marks.  See Dreamwerks, 142 F.3d at 1129.  In

2  order to facilitate the inquiry into "likelihood of confusion," the

3  Ninth Circuit listed eight factors: (1) strength of the mark; (2)

4  proximity or relatedness of the goods; (3) similarity of sight,

5  sound and meaning; (4) evidence of actual confusion; (5) marketing

6  channels; (6) type of goods and purchaser care; (7) intent; and (8)

7  likelihood of expansion.   See AMF Inc. v. Sleekcraft Boats, 599

8  F.2d 341, 348-49 (9th Cir. 1979).  Those factors were "intended to

9  guide the court in assessing the basic question of likelihood of

10 confusion."  E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d

11 1280, 1290 (9th Cir. 1990).

12        "In the usual infringement case, these factors are applied to

13 determine whether the junior user is palming off its products as

14 those of the senior user."  Dreamwerks, 142 F.3d at 1130.  In other

15 words, the question is whether "a consumer who finds a running shoe

16 marked Mike [would] be bamboozled into thinking that it was

17 manufactured by Nike?"  Id.   Conversely, in a reverse confusion

18 case, palming off is often not in issue, as neither junior nor

19 senior user wishes to profit from the other's goodwill.  See id.

20        The question in such cases is whether consumers doing
          business with the senior user might mistakenly believe
21        that they are dealing with the junior user.  More
          specifically, the question here is whether a reasonable
22        consumer [purchasing plaintiffs' transponder and related
          material] might do so believing that it is [buying such
23        product from Pfizer]
   Id.

24 ///

25 ///

26 ///

27 ///

28 ///

1    This is a case of reverse confusion.[30]  (See Feb. 28, 1999

2  Order.)  Thus, the Court must look at the record to determine

3  whether plaintiffs have presented sufficient evidence to support the

4  ultimate conclusion that the plaintiffs' consumers are likely to be

5  confused as to the source of plaintiffs' products.  In doing so, the

6  Court looks at the Sleekcraft factors.  Defendant concedes that the

7  Trovan mark is strong, and that the two marks are similar.[31]  Thus,

8  the Court does not analyze these two factors and recognizes that

9  they both weigh in plaintiffs' favor.  However, defendant argues

10 that, based on the other factors, the jury could not have found

11 likelihood of confusion.

12               **a.   Proximity or Relatedness of the Goods**

13    As discussed above, both parties dispute the relatedness of the

14 goods.  As stated above, the Court found that the two products were

15 not unrelated as a matter of law.  Thus, the question becomes

16 whether the jury could have found that the goods or products were

17 related.  Although it is true that plaintiffs' products are not

18 currently used for human application, it is undisputed that

19

20      [30]   Contrary to plaintiffs' argument to the jury, that is
   the only claim before the jury.  (Tr. 4188.)  ("And you heard a lot
21 of testimony about reverse confusion, forward confusion.  Our
   expert, Dr. Jacoby said there is just confusion, and that is what we
22 believe.")  At oral argument on this motion, plaintiffs restated
   their belief that this case involved both forward and reverse
23 confusion.  Even if this were true, the only harm claimed by
   plaintiffs arise from the reverse confusion which was allegedly
24 created in the marketplace--namely, the loss of control over their
   mark.  Plaintiffs have disavowed any claims that Pfizer intended to
25 trade on their good name.  Thus, plaintiffs would not be entitled to
   any damages on that forward confusion claim.
26
27      [31]   Furthermore, both parties seem to agree that "intent" is
   irrelevant in cases of reverse confusion.  See Dreamwerks, 142 F.3d
28 1130.  Thus, in determining likelihood of confusion this factor is
   legally irrelevant thereby making its analysis unnecessary.

1   plaintiffs' Zip Quill contains an antibiotic - amoxycillin.

2   Understandably, that fact alone does not make the products "related"

3   as a matter of law.[32]  However, the jury could have found that the

4   presence of an antibiotic in one of plaintiffs' products rendered

5   their mark somewhat related to defendant's product--an antibiotic.

6   Thus, the jury could have weighed this factor in plaintiffs' favor.

7                    b.   **Evidence of Actual Confusion**

8        Defendant argues that plaintiffs did not introduce any relevant

9   evidence of actual confusion.  Lacking such evidence, defendant

10  argues that the jury could not have found for plaintiffs.  Absence

11  of actual confusion, however, does not necessarily "create an

12  inference that there is no likelihood of confusion."  Gallo, 967

13  F.2d at 1292.  Furthermore, plaintiffs argue that they have provided

14  evidence of actual confusion.  Specifically, that evidence is:

15  testimony of a pet owner (Tr. 1761-1763); a veterinarian (Tr.

16  2554:11-17, 2557-2563); a pharmacy student (Tr. 2131 (although this

17  probably refers to exhibit No. 2131, not transcript page 2131)); and

18  customer calls to plaintiffs' distributor, InfoPET (Tr. 530-532).

19  Plaintiffs also argue that the consumer survey by Dr. Jacoby showed

20  substantial confusion among doctors and veterinarians.  (Tr. 2413-

21  2415.)

22                    i.   **Non-Survey Evidence**

23                         (A)   Ms. Benefiel, the Pet Owner

24       Plaintiffs point to Ms. Benefiel as evidence of actual

25  confusion.  However, Ms. Benefiel's testimony does not support

26  plaintiffs' claim of reverse confusion.  Ms. Benefiel thought that

27

28       [32]   On the contrary, the evidence of relatedness is dubious
    at best.

                              -43-

the Trovan drug (defendant's product) might be what was implanted in
her cat, when in fact, it was plaintiffs' Trovan.  (Tr. 1761.)   This
is confirmed by the e-mail which she sent to InfoPET.   In it, she
asks whether Pfizer's drug is "the product that is used in the
implantation of microchips in animals?  If so, are my two cats and
my dog in any danger?"  (Trial Ex. 2112.)   Thus, she thought that
defendant's drug might be plaintiff's product, and could potentially
be in her cat.   This is forward confusion.  Had this been reverse
confusion, Ms. Benefiel would have contacted someone at Pfizer, as
she would have thought that plaintiffs' transponder was Pfizer's
product.   Thus, her testimony is irrelevant to the issue of reverse
confusion.

### (B) Dr. Buffam, the Veterinarian

Pages 2557 through 2563 memorialize an exchange between a
veterinarian (Dr. Buffam) and Ms. Dwight, one of plaintiff's
attorneys.  As discussed above, this witness disavowed any confusion
as to source.  (Tr. 2561.)   Rather, he testified that he did not
think that an advertisement for Pfizer's Trovan was "referring to
Mr. Masin's product."  (Tr. 2561.)   Apparently, what this witness
was confused about was "why [defendant] named [its product] Trovan?"
(Tr. 2561.)   Confusion as to one's business decision does not
constitute confusion as to source.  Furthermore, this witness's
testimony refutes plaintiffs' argument, as he was not confused as to
source at all.   Instead, this witness knew that plaintiffs had a
registered trademark in the name Trovan.  (Tr. 2561.)   He was only
confused as to Pfizer's decision to use the name, not the source of
the product.  (Tr. 2561.)   Thus, there is no chance that this
witness thought that it was plaintiffs who were possibly infringing

-44-

1  on Pfizer's trademark.

2                      (C)  The Pharmacy Student

3       Next, plaintiffs argue that the evidence shows that a pharmacy

4  student was actually confused as to source.  This student contacted

5  EID in order to obtain promotional items for the Trovan antibiotic.

6  (Tr. Ex. 2131.)  This e-mail is the one documented instance of

7  reverse confusion.    However, a pharmacy student is the wrong

8  "audience" for confusion in this case.  In this case, plaintiffs

9  must show that consumers (or potential consumers) of their products

10  (veterinarians, pet owners, etc.) would purchase their products

11  thinking they are made by Pfizer.[33]

12                      (D)  Customer Calls to InfoPET

13      Plaintiffs next argue that customer calls to InfoPET show

14  actual confusion.   (Tr. 530-532.)  However, the substance of those

15  calls was never admitted at trial, and thus never properly before

16  the jury.  As such, it cannot form a basis for supporting the

17  verdict.  As to the testimony of Mr. Culberth, he testified that he

18  spoke to a few callers who asked "unusual" questions that gave him

19  the impression that they thought InfoPET was distributing Trovan.

20  (Tr. 531, 537.)  However, there was no evidence as to who these

21  callers were and whether they were potential buyers of plaintiffs'

22  or defendant's product.

23  ///

24

25         [33]     "The question in [reverse confusion] cases is whether
26  consumers doing business with the senior user might mistakenly
    believe that they are dealing with the junior user."  Dreamwerks,
27  142 F.3d at 1130.  The only consumers who could potentially do
    business with the senior user here are veterinarians or pet owners
28  (or other who seek passive identification systems).  Clearly,
    pharmacy students do not fall within those categories.

                                   -45-

1                    **ii.  The Jacoby Survey**

2        Defendant argues that the Jacoby survey was not sufficient to

3   show confusion.   Plaintiffs commissioned two likelihood of confusion

4   surveys from Dr. Jacob Jacoby.   One of these surveys was directed at

5   physicians, and the other at veterinarians.   At issue in this motion

6   is the methodology used by Dr. Jacoby for both surveys.   In a

7   separate motion, defendant also attacks the admissibility of the

8   physician survey.   (See Motion No. 6.)   The Court addresses both

9   contentions here.

10                   (A)   The Current Motion

11       In this motion (Motion No. 3), defendant argues that the

12  survey's methodology was flawed in two material ways.   First,

13  defendant argues that the study did not test for confusion using any

14  marketing method currently employed by plaintiffs.   Second,

15  defendant argues that the survey was nothing more than a side by

16  side comparison, which is prohibited because it bears little

17  resemblance to the actual working of the marketplace.

18       These two flaws are methodological in nature and do not affect

19  the admissibility of the survey.   At least on two occasions, the

20  Ninth Circuit has stated that surveys in trademark cases are to be

21  admitted as long as they are conducted according to accepted

22  principles.  See Gallo, 967 F.2d at 1292; Prudential Ins. Co., 694

23  F.2d at 1156.   Here, defendant does not challenge the "principles"

24  underlying the survey.   Rather, defendant criticizes the questions

25  used, and the way they were used.   These two "flaws" pertain to

26  technical unreliability, which goes to the weight accorded a survey,

27  not its admissibility.  See Gallo, 967 F.2d at 1292.   Thus,

28  defendant's argument in motion number three fails.

                              -46-

1
          (B)   <u>Defendant's Motion for Judgment as a</u>
               <u>Matter of Law Based on the Improper</u>

2
               <u>Admission of the Jacoby Physician</u>
               <u>Survey and Accompanying Testimony by</u>

3
               <u>Dr. Jacoby (Motion No. 6)</u>

4      In Motion Number 6, defendant argues that they are entitled to

5 a new trial because the Jacoby Physician survey was based on a

6 hypothetical product: a "human" version of the Trovan Zip Quill.

7 Defendant argues that such "hypothetical" product cannot form the

8 basis of a likelihood of confusion survey, where there is no

9 evidence that plaintiffs will be able to offer such product in the

10 foreseeable future.

11      Although it is questionable whether plaintiffs will be able to

12 market a Trovan Zip Quill approved for human uses in the future,

13 admission of Dr. Jacoby's physician survey does not, by itself,

14 mandate judgment as a matter of law or require a new trial.  This

15 survey illustrates likelihood of expansion, one of the factors the

16 jury could have considered in determining likelihood of confusion.

17 See <u>Dreamwerks</u>, 142 F.3d at 1130 (holding that likelihood of

18 confusion can be found on less than all eight of the <u>Sleekcraft</u>

19 factors).  Thus, defendant's motion (whether meritorious or not) is

20 not determinative to the likelihood of confusion decision.  As such,

21 that motion is denied.

22               **c.   Marketing Channels**

23      Defendant argues that the parties' marketing channels are

24 completely dissimilar.  In doing so, defendant points to the

25 differences between the way it marketed Trovan, the drug, and the

26 way plaintiffs marketed Trovan, the transponder.  Plaintiffs'

27 primary marketing tool is the Internet.  (Tr. 1010:23, 2952:10,

28 2959-2964.)  Defendant also markets on the Internet (although the

-47-

1    evidence adduced at trial shows that it does so in order to provide

2    information to the physicians interested in Trovan, the drug).

3    However, defendant argues, passive "posting" of product information

4    does not constitute marketing.  Whether posting information on the

5    Internet is a recognized form of marketing is a question for another

6    day.  Here, the evidence showed that both plaintiffs and defendant

7    used the Internet to provide their consumers information about their

8    products.  From that fact alone, the jury could have inferred that

9    both companies used the Internet as a marketing tool.

10        Plaintiffs also argue that both they and defendant use press

11   releases as a means of marketing.  Defendant argues that such press

12   releases are "news" and cannot be considered marketing.  Defendant

13   errs.  Although an unsolicited article in a newspaper about Trovan

14   (the drug or the transponder) may be considered news, that is so

15   only because the reference is unsolicited.  However, press releases

16   are different.  They are drafted by the company to alert the "world"

17   that a new product or a new service is now available to the public.

18   Obviously, the more "newsworthy" the product, the more coverage it

19   will get.  At that point, the content of the press release may

20   become "news."  However, that does not make the original press

21   release itself news.

22        Defendant also points to other divergent means of marketing.

23   However, the aforementioned examples provided sufficient evidence

24   for the jury to find that this factor weighs in plaintiffs' favor.

25   As such, the Court need not address defendant's remaining arguments.

26              **d.   Type of Goods and Purchaser Care**

27        Defendant next argues that the jury could not have weighed this

28   factor in favor of plaintiffs because the undisputed evidence shows

1  that the purchaser of the parties goods are sophisticated,[34] and

2  thus, the likelihood of confusion is reduced.  This factor has

3  little bearing in a reverse confusion case.  Purchasers of

4  plaintiffs' products (such as veterinarians) may be sophisticated,

5  "but that sophistication may result in an awareness that Pfizer has

6  a division producing animal healthcare products."  (Feb. 24, 1999

7  Order.)  Consequently, the jury could have found that such knowledge

8  may make it more likely that plaintiffs' sophisticated customers

9  will be confused as to plaintiffs' relationship with Pfizer.  For

10  that reason, the jury could have found that this factor weighs in

11  plaintiffs' favor.

12                    e.    **Likelihood of Expansion**

13       Finally, defendant argues that the jury could not have found

14  that this factor weighed in plaintiffs' favor, as mere speculation

15  is insufficient to show intent to expand.[35]  Even if defendant were

16  correct and this factor does weigh in its favor, the preceding

17  discussion indicates that judgment as a matter of law on the issue

18  of likelihood of confusion is inappropriate.  In balancing all the

19  factors, the jury could have found that this factor weighed in

20  defendant's favor, and yet still found defendant liable.

21                    3.    **New Trial**

22       Defendant next argues that the Court should grant a new trial

23  because the finding of confusion, even if supported by the evidence,

24

25       [34]     To argue that plaintiffs' consumers (specifically Ms.
26  Benefiel) are "sophisticated," stretches the meaning of the word.
    According to her testimony, she apparently did not know the
27  difference between a transponder and an antibiotic.

28       [35]     Motion number six also addresses this topic, albeit in
    the context of Dr. Jacoby's physician survey.  That motion was
    previously denied.  See supra.

1 was tainted by the admission of the fraudulent letters.[36]

2 Addressing the fraudulent evidence, there is no question that the

3 evidence was inadmissible and that its viewing by the jury was

4 error. Under Rule 103 of the Federal Rules of Evidence, this court

5 must address a challenged evidentiary decision to determine whether

6 "a substantial right of the party is affected." "'When evidence is

7 charged to have been improperly admitted, any error is more likely

8 to be found harmful, and thus reversible, if the evidence is

9 substantively important, inflammatory, repeated, emphasized, or

10 unfairly self-serving.'" Doty v. Sewal, 908 F.2d 1053, (1st Cir.

11 1990) (quoting S. Childress & M. Davis, 1 Standards of Review 239

12 (1986)). However, not all error is error which requires a new

13 trial. The Court must "disregard any error or defect in the

14 proceedings which does not affect the substantial rights of the

15 parties." Fed. R. Civ. P. 61.

16 Certainly, the Court is troubled by the fraud committed upon

17 it. These letters, which attempted to show actual confusion, are

18 clearly made up and have no probative value whatsoever. Plaintiffs

19 and their counsel feign ignorance. Had this been the only incident

20 indicating complete disrespect for the Federal Rules of Evidence or

21 this Court's rulings, the Court may be tempted to believe them.

22 However, plaintiffs' counsel were consistent in their complete

23 disregard (or reckless ignorance) of those rules or the Court's

24 rulings. (See generally Def.' Mem. P. & A. Renewed Motion Mistrial,

25

26 [36] In addressing this motion, defendant asks that this Court consider all the attorney misconduct described in defendant's Renewed Motion for a Mistrial. Although the Court considers the
27 arguments and evidence presented in Pfizer's Renewed Motion for a
28 Mistrial, the Court does not substantively address that motion here. That motion is addressed below, at Part IV.F.

1    passim.)  Thus, plaintiffs and their counsel's credibility here is

2    somewhat diminished.[37]  Nonetheless, the Court's decision on this

3    issue certainly does not depend on its perception of the ethics or

4    honesty of plaintiffs and their counsel.  Rather, the Court

5    objectively looks at the letters and their impact on the jury, and

6    whether such impact is sufficient, in light of the Court's

7    admonition, to warrant a reversal of the jury's liability verdict.

8    Plaintiffs, for whatever reason, have chosen not to address this

9    issue in their opposition.  Thus, the Court is tempted to assume

10   that they agree with defendant's characterization.[38]  However,

11   based on the following analysis, the Court finds that the evidence

12   was so prejudicial, that it did in fact affect Pfizer's substantial

13   rights.

14        Here, there is no question that the evidence was substantively

15   important.  Evidence of actual confusion is a great indicator of

16   likelihood of confusion.  Furthermore, it is beyond doubt that the

17   evidence was unfairly self-serving.  Additionally, it is

18   unquestionable that these letters had an effect on the jury.  As

19   discussed above, the evidence supporting the Sleekcraft factors is

20   remote, at best.  Thus, any evidence of actual confusion clearly

21   reinforced any belief the jury may have had relating to likelihood

22   of confusion, or alternatively, shatter any doubt it had regarding

23

24       [37]     Furthermore, the evidence provided by defendant makes it
     improbable that plaintiffs and plaintiffs' counsel were unaware of
25   the fraud upon the Court.  Some of the alleged "writers" of the
     fraudulent letters had the same return address as plaintiffs'
26   distributor--InfoPET.  (Tr. 2025-22.)

27       [38]     Or, it may be that plaintiffs' new counsel would rather
     not follow the same path as plaintiffs' ethically-challenged trial
28   counsel by arguing that the letters were not fraudulent, when a
     cursory review of them clearly indicates they are.

                                    -51-

1 | non-confusion.   To compound the damage created by the fraudulent

2 | evidence, the Court does not believe that the admonition to the jury

3 | regarding the excluded evidence cured the defect.   On the contrary,

4 | the exclusion of the evidence reinforced plaintiffs' trial theme--

5 | namely, that the defendant (and the Court) would stop at nothing to

6 | keep the "real facts" away from them.   (See infra, Part IV.F.)

7 | Thus, defendant is entitled to a new trial on the issue of

8 | likelihood of confusion.

9 |     **D.**    **Defendant's Motion For Judgment as a Matter of Law in**
**Favor of Pfizer Inc. on The Issues of Willfulness Under**

10 | **Federal Law And Malice, Fraud, or Oppression Under State**
**Law Or, in The Alternative For a New Trial (Motion No. 4)**

11 |

12 |     In this motion, defendant argues that it is entitled to a

13 | judgment as a matter of law on the damage portion of the verdict

14 | because plaintiffs failed to show "willful infringement" or "bad

15 | faith infringement."   Specifically, Pfizer argues that the jury

16 | could not have found "willful infringement" because (1) there can be

17 | no bad faith where there is no evidence of palming off; (2) knowing

18 | adoption of a mark knowing of another's objection alone does not

19 | constitute bad faith or wilfulness; and (3) having no grounds for

20 | bad faith, the jury's punitive damage award must be reversed.

21 |           **1.**    **Can There Be Bad Faith Where There Is No Evidence of**
**Palming Off?**

22 |     Defendant first argues that where there is no palming off,

23 | there can be no bad faith.   To support this argument, defendant

24 | cites to a myriad of forward confusion cases.   (See Def.'s Mem. P. &

25 | A. Motion No. 4 at 6.)   If this Court were to endorse defendant's

26 | theory, no jury could ever find bad faith in a case of reverse

27 | confusion, as palming off is not necessary to show a violation of

28 | the Lanham Act.   For that reason, the Court refuses to adopt this

reasoning.[39]  Conversely, plaintiffs argue that the mere adoption of

a trademark by a large company, knowing of its prior use by a

smaller company, constitutes bad faith.  There is no support, in law

or in logic, for this argument.  See Lindy Pen Co., 982 F.2d at 1406

(mere "knowing use in the belief that there is no confusion" is not

bad faith for purposes of an award of actual damages)  For that

reason, the Court refuses to adopt that rule here.

### 2.   Lacking Any Evidence of Palming Off, Intent to Infringe Must Be Shown Through Bad Faith

In a case of forward confusion, bad faith is often established

by looking at the actions of the junior user and asking whether that

user intended to profit by "palming off" the senior user's goods.

Lindy Pen Co., 982 F.2d at 1406.  As the parties correctly point

out, no cases in the Ninth Circuit have addressed "bad faith" in the

context of reverse confusion.  Other circuits, in somewhat different

contexts, have found such "bad faith" in a case of reverse

confusion.  In Sands I, the Seventh Circuit, recognizing that

palming off is often not present in cases of reverse confusion, held

that an award of damages (based on an accounting of profits) was

proper, provided the plaintiff show "bad faith."  See Sands I, 978

F.2d at 961 (rejecting the defendant's claim that an award of

profits is only appropriate where a plaintiff shows unjust

enrichment).

In that case, the finding of bad faith was predicated on (1)

the defendant's failure to conduct a basic trademark search until

days before the airing of the infringing advertising and then

---

[39]      The Court is not the first to reject such theory.  Both
the Tenth and the Seventh Circuits in Big O Tires and Sands,
respectively, have found bad faith in cases of reverse confusion
(provided the evidence supports such bad faith).

1  defendant only made an anonymous, cursory investigation once it

2  obtained such a search; (2) the defendant's decision to continue the

3  infringing advertising campaign after it discovered plaintiff's

4  registration; (3) the fact that defendant did not seek a formal

5  legal opinion regarding potential trademark issues until after the

6  first infringing commercial was aired; and (4) defendant's failure

7  to take reasonable precautions to avoid the likelihood of confusion.

8  See Sands I, 978 F.2d at 947.

9      In Big O Tires, the Tenth Circuit also affirmed an award of

10  damages in a case of reverse confusion, presumably finding bad

11  faith.  See 561 F.2d at 1374.  It is unclear, however, whether the

12  defendant in that case even presented a "good faith" defense.  For

13  example, there is no indication that the defendant obtained advice

14  of counsel.  Furthermore, although the defendant attempted to

15  register the name "Big Foot," it only attempted to do so after the

16  suit was filed.  See id. at 1368.

17      These two facts, as well as the facts supporting bad faith in

18  Sands I, are in direct contrast with the facts in the case at hand.

19  Here, there is ample evidence that defendant obtained advice of

20  counsel before using the mark Trovan.  (Tr. 1840:6-14, 19-23; Tr.

21  1897:2-19; Tr. 2081:3-25; Tr. 2082:3-10; Tr. 2093:22-2094:10, 18-21;

22  Tr. 2188:21-2189:5; Tr. 2202:18-23; Tr. 2242:7-12; Trial Ex. 66;

23  Trial Ex. 67 (Pagac Decl. Ex. 36, 37).)  Furthermore, defendant

24  argued that it acted in good faith by relying on the advice of its

25  counsel.  Moreover, defendant also obtained a registration from the

26  Patent and Trademark Office for the use of the name Trovan on

27  antibiotics.  (See Trial Ex. 437, 1130 (Pagac Decl. Ex. 38, 39).)

28  Such a registration, being prima facie evidence of validity, also

1  supported defendant's claim of good faith reliance.

2       As plaintiffs argue, however, the jury has heard defendant's

3  "good faith reliance on the advice of counsel" defense.  (See Jury

4  Instructions 11, 27, Liability Phase.)  Accordingly, the jury was

5  instructed that

6       Although reliance upon competent counsel may serve as
        evidence of good faith use of a mark, it is not
7       necessarily conclusive.  When a defendant asserts that it
        relied upon advice of counsel, you must examine objective
8       evidence to see whether the claimed reliance was
        justifiable.  Counsel's opinion must be thorough enough to
9       instill a good faith belief that defendant's use of the
        trademark would not infringe on plaintiff's trademark.

10

11  (Jury Instruction 27, Liability phase.)  By returning a verdict of

12  bad faith, the jury could have believed that Pfizer's reliance on

13  the advice of its counsel was either not justifiable, or that the

14  counsel's opinion was not thorough enough to instill a good faith

15  belief that defendant's use of the trademark would not infringe

16  plaintiffs' rights.[40]  Thus, defendant has failed to meet its burden

17  for a judgment as a matter of law on that issue.

18       Defendant does, however, raise an interesting point.  Although

19  the jury could have rejected defendant's "reliance on the advice of

20  counsel" defense based on the credibility of the witnesses, or based

21  on the thoroughness of the advice, defendant's trademark

22  registration with the Patent and Trademark Office provides prima

23  facie evidence that its use of the mark Trovan was not only

24  permissible, but also in good faith.[41]  Thus, the finding of bad

25       [40]    Plaintiffs provide cases upon cases holding that opinion
26  of counsel does not, by itself, provide absolution as Pfizer claims
    it does.  (Pls.' Mem. P. & A. Opp'n Motion No. 4 at 10-12.)  For the
27  purposes of this discussion, the Court will accept plaintiffs'
    position.
28       [41]    Needless to say, this is true only when a plaintiff
                                                          (continued...)

1   faith, which according to Jury Instruction twenty-eight requires a

2   finding that "the defendant's conduct was a willful and intentional

3   infringement of plaintiff's trademark,"[42] in the special verdict in

4   this case is wholly inconsistent with jury instruction 13, which

5   stated that:

6          The owner of a trademark may obtain a certificate of
           registration issued by the United States Patent and
7          Trademark Office and may rely on that certificate as prima
           facie evidence of the validity of the registered mark, the
8          registrant's ownership of the mark and of the registrant's
           exclusive right to use the mark in connection with the
9          goods specified in the registration.

10  (Jury Instruction 13, Liability Phase.)

11         Having before it the defendant's registration, and no evidence

12  to indicate defendant obtained this registration in bad faith, the

13  jury could not have rendered a verdict of bad faith based on this

14  evidence.  As such, the Court grants defendant's motion for judgment

15

16  _____

          [41]     (...continued)
17  fails to bring a claim for fraud on the patent office.  Here, not
    only did plaintiffs not bring a claim for fraud on the Patent and
18  Trademark Office, but plaintiffs provided no evidence which indicate
    that defendant misled the Patent and Trademark Office when it filed
19  its application.

20        [42]    See Jury Instruction 28, Liability Phase.  That
    instruction stated that:
21
          If you find that the defendant infringed the
22        plaintiff's trademark, you must then determine whether the
          defendant used the trademark in bad faith, knowing it was
23        an infringement.
          In order to find bad faith you must conclude that the
24        defendant's conduct was a willful and intentional
          infringement of plaintiff's trademark.  A party who
25        believes in good faith that it has a right to use a
          trademark already in use because its use will not result
26        in infringement does not act in bad faith.
27        Plaintiff has the burden of proving by a
          preponderance of the evidence that defendant acted in bad
28        faith.  In making this determination you must consider all
          of the evidence.

                                  -56-

1  as a matter of law on the issue of bad faith.  In the alternative,

2  the Court finds that the jury verdict as it relates to bad faith is

3  against the clear weight of the evidence and was a miscarriage of

4  justice.  Thus, defendant is entitled to a new trial on that issue

5  as well.

6          **3.   Having No Grounds For Bad Faith, The Jury's Punitive
                Damage Award Must Be Reversed**

7

8      Defendant next argues that having no grounds for a finding of

   bad faith, the jury could not have found that defendant acted

9  maliciously, fraudulently, or oppressively in using the mark.

10 Although this Court has found that California would not recognize a

11 claim of reverse confusion in the context of common law unfair

12 competition with the present facts, and thus depriving plaintiffs of

13 punitive damages based on that claim, the Court nevertheless shall

14 address this issue in the alternative.  Thus, assuming that

15 California would recognize the aforementioned reverse confusion

16 claim, the Court now decides whether the evidence presented supports

17 the jury's finding of malice, fraud, or oppression.

18     Plaintiffs argue that under the California standard for

19 punitive damages,[43] the plaintiffs were not required to show that

20

21 ─────────────

22     [43]     See Cal. Civ. Code § 3294(c)(1) provides that:

23     (a) In an action for the breach of an obligation not
       arising from contract, where it is proven by clear and
       convincing evidence that the defendant has been guilty of

24     oppression, fraud, or malice, the plaintiff, in addition
       to the actual damages, may recover damages for the sake of

25     example and by way of punishing the defendant.

26                              . . .

27     (c) As used in this section, the following definitions
       shall apply:

28

                                           (continued...)

1  Pfizer had a specific intent to harm plaintiffs.  Rather, they argue

2  that the jury could have found that the actions of Pfizer and its

3  counsel when they learned of plaintiffs' rights did not amount to

4  "mere carelessness," but instead showed a "deliberate and willful

5  disregard of [plaintiffs'] property rights," or in other words--

6  malice  (Mem. P. & A. Opp'n Motion 4.)  To support their contention,

7  plaintiffs cite to Big O Tires, 561 F.2d at 1373.

8      That case, however, is of little persuasive value on that

9  issue.  First, any discussion as to malice was within the context of

10  Colorado's "trademark disparagement" jurisprudence.  See id. at

11  1373.  Second, the issue of good faith reliance on the PTO (or on

12  advice of counsel) was not addressed by the court (and, from the

13  facts of the case, it appears that the defendant did not register

14  its trademark with the PTO).  See generally id.  Lacking any direct

15  case authority on the issue, the Court reverts to the traditional

16  standard on motions for judgment as a matter of law:  namely,

17  whether the jury could have found malice, oppression, or fraud based

18  on the evidence presented.

19

20      [43]     (...continued)
          (1) "Malice" means conduct which is intended by the
21        defendant to cause injury to the plaintiff or
          despicable conduct which is carried on by the
22        defendant with a willful and conscious disregard of
          the rights or safety of others.
23

24        (2) "Oppression" means despicable conduct that
          subjects a person to cruel and unjust hardship in
25        conscious disregard of that person's rights.

26
          (3) "Fraud" means an intentional misrepresentation,
27        deceit, or concealment of a material fact known to
          the defendant with the intention on the part of the
28        defendant of thereby depriving a person of property
          or legal rights or otherwise causing injury.

1   Having decided that the jury could not have found "bad faith"

2   on the record before it, it follows that the jury could not have

3   found malice, fraud, or oppression.  First, no reading of the

4   evidence could characterize Pfizer's conduct as malicious.  Malice,

5   as defined in section 3294, means "conduct which is intended by the

6   defendant to cause injury to the plaintiff or despicable conduct

7   which is carried on by the defendant with a willful and conscious

8   disregard of the rights or safety of others."  Cal. Civ. Code §

9   3294.  Here, having found that the PTO's registration and the

10  absence of any evidence that defendant obtained the registration in

11  bad faith negated any finding of willful infringement, defendant

12  could not have intended to cause injury to the plaintiff.  Second,

13  the jury could not have found that Pfizer's conduct was oppressive.

14  Oppression, as defined in section 3294 means "despicable conduct

15  that subjects a person to cruel and unjust hardship in conscious

16  disregard of that person's rights."  Id.  Here, the evidence does

17  not support a finding of "conscious disregard," as Pfizer was

18  entitled to rely on the PTO's trademark registration in marketing

19  its product.  Finally, the jury could not have found that Pfizer's

20  conduct was fraudulent.  Fraud, as defined in section 3294, means

21  "an intentional misrepresentation, deceit, or concealment of a

22  material fact known to the defendant with the intention on the part

23  of the defendant of thereby depriving a person of property or legal

24  rights or otherwise causing injury."  Id.  Here, although the

25  evidence may support a finding that Pfizer misrepresented its

26  position to plaintiffs (by telling Mr. Masin that it was too late

27  for Pfizer to change the name of the drug when it was ready to do so

28

for Johnson & Johnson),[44] the evidence does not support (1) that
such misrepresentation was of a material fact and (2) that it was
withheld with the intention of depriving plaintiffs of a legal
right, as Pfizer was justified in relying on the PTO's registration.

Thus, with the evidence before it, the jury could not have
found that defendant's conduct was malicious, oppressive, or
fraudulent.  As a result, defendant's motion for a judgment as a
matter of law on that issue is granted.  In the alternative, the
Court finds that the jury verdict as it relates to malice,
oppression, or fraud is against the clear weight of the evidence and
was a miscarriage of justice.  Thus, defendant is entitled to a new
trial.

**E.   Defendant's Motion For Judgment as a Matter of Law on The Jury's Punitive Damage Award Or, in The Alternative For a New Trial or Remittitur on The Award (Motion No. 5)**

In this motion for judgment as a matter of law, defendant
argues that (1) plaintiff's failure to introduce any evidence of
Pfizer's net worth requires that the jury's punitive damage award be
vacated and (2) that even if the punitive damage award is not
vacated, the award is excessive as a matter of law and must be
reduced.

**1.   Plaintiffs Did Introduce Evidence of Pfizer's Net Worth**

First, defendant argues that plaintiffs did not offer any
evidence of Pfizer's net worth.  Pfizer errs.  Trial exhibit 394
(see Anderson Decl. Ex. 27) is Pfizer's 1998 annual report.  That
report thoroughly outlines all pertinent financial information
regarding Pfizer for that year.  Thus, the jury had sufficient

---

[44]   See Tr. 4360:10-13; 4360:25-4361:3.

1    information to determine Pfizer's net worth.

2        **2.    Even If The Jury's Punitive Damage Award Is Not Vacated, The Award Is Excessive**

3        Pfizer next argues that even if the punitive damage award is

4    not vacated, the award is excessive as a matter of law and thus must

5    be remitted.  Having found that the punitive damage award must be

6    vacated because (1) California would not recognize a cause of action

7    for reverse confusion in the context of common law unfair

8    competition if presented with the instant facts and (2) because the

9    evidence does not support the jury's finding of malice, oppression,

10   or fraud, the following discussion addresses the issue of remittitur

11   as an alternative ground.

12       **a.    Standard for Reviewing Punitive Damage Award Under California Law**

13

14       The Lanham Act does not authorize the award of punitive

15   damages.  See Getty Petroleum Corp. v. Bartco Petroleum Corp., 858

16   F.2d 103, 113 (2d Cir. 1988).  As punitive damages are only

17   available under California law, see, e.g., Transgo, Inc. v. Ajac

18   Transmission Parts Corp., 768 F.2d 1001, 1024 (9th Cir. 1985), the

19   Court must look to California law in order to assess the propriety

20   of a punitive damage award.  Punitive damages are properly awarded

21   to punish wrongdoers and deter others from committing future

22   wrongful acts.  See Adams v. Murakami, 54 Cal. 3d 105, 110 (1991);

23   Las Palmas Assos. v. Las Palmas Center Assocs., 235 Cal. App. 3d

24   1220, 1243 (1991).  They are not to be awarded on the basis of jury

25   passion or prejudice, and the Court must overturn them if it appears

26   that the punitive damages were the product of such improper motives.

27   See Harmsen v. Smith, 693 F.2d 932, 947 (9th Cir. 1982);

28   Glovatorium, Inc. v. NCR Corp., 684 F.2d 658, 663 (9th Cir. 1982);

-61-

1  Neal v. Farmers Ins. Exch., 21 Cal. 3d 910, 928 (1978); Rosener v.

2  Sears, Roebuck & Co., 110 Cal. App. 3d 740, 749-50 (1980).  The

3  Court must look to three factors to determine whether the jury's

4  punitive damage award was the product of passion or prejudice.

5       First, the Court must be satisfied that there was evidence

6  indicating that the defendant acted in a sufficiently reprehensible

7  way to justify the award of punitive damages.  See Las Palmas

8  Associates, 235 Cal. App. 3d at 1243-44; Rosener, 110 Cal. App. 3d

9  at 751 (citing Neal, 21 Cal.3d at 928); Zhadan v. Downtown L.A.

10  Motors, 66 Cal. App. 3d 481, 499-500 (1976).  In the case of

11  California common law unfair competition claims, a defendant must

12  have acted in conscious disregard for the rights of another.  See,

13  e.g., Transgo, Inc., 768 F.2d at 1024-25.

14       Second, there must be some reasonable relationship between the

15  punitive damage award and the defendant's financial status.  Just as

16  a large punitive damage award may be needed to punish and deter a

17  wealthy defendant, a smaller award is appropriate for a less wealthy

18  defendant.  The Court must determine on a motion for a judgment as a

19  matter of law whether the jury's punitive damage award is so

20  disproportionately high compared to the defendant's financial status

21  that it must be the result of jury passion or prejudice.  See Neal,

22  21 Cal. 3d at 928 ("[T]he function of punitive damages is not served

23  by an award which, in light of the defendant's wealth and the

24  gravity of the particular act, exceeds the level necessary to

25  properly punish and deter.").  A necessary prerequisite to such a

26  determination is the presence of "meaningful evidence" in the record

27  of the defendant's financial status.  See Adams, 54 Cal. App. 3d at

28  109.

1   The third requirement for punitive damages is that the award

2   must bear some reasonable relationship to the amount of compensatory

3   damages awarded by the jury.  See Harmsen, 693 F.2d at 947; Biundo

4   v. Old Equity Life Ins. Co., 662 F.2d 1297, 1300 (9th Cir. 1981);

5   Adams, 54 Cal. 3d at 111; Las Palmas Associates, 235 Cal. App. 3d at

6   1243-44.  Although there is no fixed ratio of punitive to

7   compensatory damages by which the Court may evaluate the award,

8   "even an act of considerable reprehensibility will not be seen to

9   justify a proportionally high amount of punitive damages if the

10  actual harm suffered thereby is small."  Neal, 21 Cal. 3d at 928;

11  see also Rosener, 110 Cal. App. 3d at 751.  The Court must be

12  certain that the punitive damage award meets all three of these

13  requirements.  See Adams, 54 Cal. 3d at 111.  If the award does meet

14  these requirements, then the jury's decision must be upheld.

15              b.   Application

16      Here, as discussed above, the Court is not satisfied that there

17  was evidence indicating that the defendant acted in a sufficiently

18  reprehensible way to justify the award of punitive damages.  As

19  previously analyzed, the Court found that defendant reasonably

20  relied in good faith on the PTO's registration of the Trovan

21  trademark for use with an antibiotic.  Furthermore, there is ample

22  evidence on the record that Pfizer sought substantial advice from

23  both inside and outside counsel regarding the use of the mark.

24  Additionally, the record reflects evidence that Pfizer came up with

25  the mark independently, without any indication that plaintiffs' mark

26  even existed.  Thus, plaintiffs have not met the first element.

27      As to the second element, the record shows that plaintiffs

28  provided sufficient evidence to justify the size of the award in

-63-

1  relation to Pfizer's ability to pay.  However, as to the third
2  element, the Court finds that the punitive damage award is
3  disproportionate to the amount of actual damage suffered by
4  plaintiffs.  "[E]ven an act of considerable reprehensibility will
5  not be seen to justify a proportionally high amount of punitive
6  damages if the actual harm suffered thereby is small."  Neal, 21
7  Cal. 3d at 928.  Here, plaintiffs have not shown one lost sale.
8  Furthermore, plaintiffs' evidence of injury to goodwill is dubious
9  at best.  None of the testimony elicited by plaintiffs show that
10 their reputation was damaged by the infringement.  Rather, damage to
11 their goodwill has to be inferred from the negative publicity
12 associated with defendant's drug--an event clearly outside the
13 control of defendant, and irrelevant to Pfizer's conduct in adopting
14 the mark.  Finally, the ratio of punitive damages, even if compared
15 to the size of the compensatory damage award granted by the jury, is
16 not supported by the evidence.  The conduct at issue certainly does
17 not warrant a seventeen-to-one ratio of punitive damages.

18      Thus, having met only one of the elements supporting the size
19 of the punitive damage award, the Court finds that the amount of the
20 jury's punitive damage award cannot be upheld as a matter of law.
21 Rather, the Court finds that should any punitive damage award be
22 found appropriate, a punitive damage award of $1,500,000 (or three
23 times the amount of compensatory damage supported by the evidence)
24 would be more appropriate in this case.  Thus, should this issue
25 become relevant, the Court finds that plaintiffs, if they agreed,
26 would only be entitled to $1,500,000 in punitive damages.  Should
27 plaintiffs not agree to such a reduction, the Court finds that a new
28 trial would be needed to determine the amount of punitive damages

-64-

1  plaintiffs should recover.[45]

2    **F.   Pfizer's Renewed Motion For a Mistrial**

3        In its renewed motion for a mistrial, Pfizer argues that (1) a

4  mistrial is warranted because plaintiffs' counsel's misconduct

5  infected every aspect of the trial; (2) that the punitive damage

6  award was based upon attorney misconduct and must be set aside; (3)

7  that plaintiffs' counsel improperly referenced and elicited

8  inadmissible testimony; (4) that counsel engaged in misconduct to

9  try to show that plaintiffs' and defendant's products were related;

10 and (5) that plaintiffs' counsel engaged in misconduct to create the

11 impression that the court was siding with Pfizer.

12     "A new trial is warranted on the ground of attorney misconduct

13 during the trial where the '"flavor of misconduct . . . sufficiently

14 permeate[s] an entire proceeding to provide conviction that the jury

15 was influenced by passion and prejudice in reaching its verdict."'"

16 Anheuser-Busch, Inc., 69 F.3d at 346 (quoting Kehr v. Smith Barney,

17 Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir. 1984) (quoting

18 ─────────────────────

19     [45]    Similarly, the Court finds that the current award would
   violate defendant's Federal Due Process rights.  The Supreme Court,
20 in the seminal case of Gore v. BMW of America, 517 U.S. 559, 574-75
   (1996), found that three factors must be analyzed to determine
21 whether a punitive damage award is excessive:  First, the court must
   look at the degree of reprehensibility of the conduct.  See id.
22 Second, the court must look at the disparity between the harm (or
   potential harm) suffered by the plaintiffs and the punitive damage
23 award.  See id.  Third, the court must look at the disparity between
   the punitive damage award and the civil penalties authorized or
24 imposed in comparable cases.  See id.  The first two factors of the
25 Gore case have been addressed in the discussion relating to the
   propriety of the punitive damage award based on state law and weigh
26 in favor of reducing the award.  The third factor is also consistent
   with this Court's remittance.  An award of damages in a trademark
27 infringement under the Lanham Act can be trebled in certain
   circumstances (such as in cases of counterfeiting, or where the
28 court finds that such trebling would provide a deterrent against
   infringement).  See 15 U.S.C. § 1117(a), (b).

1  <u>Standard Oil Co. of Cal. v. Perkins</u>, 347 F.2d 379, 388 (9th Cir.

2  1965))).  If the misconduct permeates the proceeding, the jury is

3  "'necessarily prejudiced.'"  <u>Id.</u> (quoting <u>Kehr</u>, 736 F.2d at 1286).

4  This Court is in "a superior position to gauge the prejudicial

5  impact of counsel's conduct during the trial."  <u>Id.</u>

6       Here, the Court finds that a new trial is warranted, as the

7  misconduct of plaintiffs' attorneys permeated the trial to such an

8  extent that the Court is convinced the jury was influenced by

9  passion and prejudice in reaching its verdict.  Plaintiffs'

10  counsel's misconduct is apparent from the record.  Furthermore,

11  defendant provides a thorough summary of the misconduct in the

12  Appendix to its Renewed Motion for a Mistrial.  For the benefit of

13  the parties, however, the Court will briefly summarize some of the

14  most egregious instances.

15       **1.   Trovan Kills "Theme" and Other Improper Arguments**

16       Counsel ignored court rulings and sustained objections in order

17  to introduce evidence that Pfizer's drug caused deaths:  The Court

18  stated that it

19       precluded in a previous ruling the negative information
         about defendant Pfizer's Trovan product.  [Plaintiffs'
20       counsel] ha[s] filed papers requesting to introduce that
         information, and there have been objections, and yet you
21       ask Dr. Davis about that.  I don't understand whether it
         is intentional and strategic, or whether you have - just
22       have a very short memory.

23  (Tr. 1550.)

24       Nonetheless, plaintiffs' counsel proceeded to ask the following

25  questions:  Counsel asked Mr. Sirota if he knew what a particular

26  Pfizer press release contained (the press release contained

27  information about the deadly side effects of Trovan)  (Tr. 1695)

28  ("What was [the press release] about?").  An objection was raised

1  and sustained. Yet, plaintiffs' counsel persisted and asked the

2  same question: "Do you know what the second press release was

3  about?" The Court, at that point, had to remind counsel that the

4  objection had been sustained. Just a few minutes later, plaintiffs'

5  counsel asked the same witness if he "consider[ed] Trovan a safe

6  medication?" Once again, an objection was raised, and sustained.

7  (Tr. 1698.) A few minutes later, plaintiffs' counsel tried again:

8  "Have you received . . . complaints about the product . . . Trovan?"

9  Needless to say, an objection was raised and again sustained. (Tr.

10  1701.) Yet again, a few minutes later, plaintiffs' counsel asked

11  the same witness: "Do you know whether there has been . . . any

12  recent significant publicity about Trovan[46] . . . ?" The Court

13  raised and sustained its own objection. (Tr. 1709.) All this

14  questioning set the stage for plaintiffs' closing argument in the

15  context of punitive damages. Namely, plaintiffs counsel argued that

16  the name Trovan "is likely to remain etched in the minds of

17  consumers with a drug that kills people and that caused liver

18  dysfunction." (Tr. 513.)

19      Also during plaintiffs' closing argument, plaintiffs' counsel

20  improperly argued to the jury that Pfizer should be punished because

21  its lawyers purportedly gave it bad advice, (Tr. 5182:18-25), and

22  acted with "oppression" in rendering his opinion. (Tr. 5116:12-20.)

23  Plaintiffs' counsel also improperly suggested to the jury that

24  raising the advice of counsel defense was "malicious and oppressive"

25  and "disgusting and despicable." (Tr. 5118:10-19.) Furthermore,

26  plaintiffs' counsel made inflammatory arguments as to witness

27

28      [46]  The only "recent publicity" about Trovan addressed its
   deadly side effects.

-67-

credibility and competence in the context of his argument for an award of punitive damage. (Tr. 5122-5123.) Of course, such conduct (even if supported by the evidence) cannot support an award of punitive damages.

## 2.   Alleged Potential Uses

Plaintiffs' counsel, after being specifically told not to elicit information from Mr. Andrews regarding potential uses of the Trovan microchip in the human medical field, (Tr. 906), asked the following question: "You mentioned earlier[47] that there was a use of the transponder with respect to diabetic patients." (Tr. 931.) Defendant raised an objection, which was sustained, and prompted the Court to state: "You are going into the area that has previously been ruled upon and stricken, so please stay away from that area." (Tr. 931.)

Counsel also engaged in misconduct to try to show that plaintiffs' and defendant's products were related by asking the witnesses to speculate about future use of the Trovan transponder. For example, Mr. Levin asked Mr. Masin if he was "aware of various potential uses of [the] Trovan products; in other words, things that it hasn't actually been used for but could be used for?" In response to that question, the Court excused the jury and took its morning break. Before stepping off the bench, the Court had the following conversation with Mr. Levin:

> Mr. Levin, that question you are asking him to speculate,
> 'what potential uses does that product have,' you are
> asking him to sit around and muse as to what potential
> uses it has. Now, I have consistently been sustaining
> objections on lack of foundation. I am quite sure that

---

[47]   What had been mentioned earlier was stricken from the record, as the witness volunteered information which was not to be discussed. (Tr. 923-924.)

1  you have litigation experience and know what that means.
   So that should alert you not to ask any question without
2  the proper foundation.

3  (Tr. 982.)  Mr. Levin's response to the Court, however, demonstrates

4  that the Court was mistaken at least as to one thing--Mr. Levin's

5  litigation experience:  "Your Honor, with all due respect to the

6  Court, I would take exception and my problem is this:  I can't put

7  on my case with this type of limitations, his device, if I can't

8  explain . . . on how they can be used."  (Tr. 983.)  Of course, the

9  "limitations" Mr. Levin was referring to are the Federal Rules of

10 Evidence.  As counsel's behavior throughout the trial confirms, he

11 was correct.  Thus, unable to do "put on his case" within the bounds

12 of the Rules, he did so in complete disregard of them.  For example,

13 after being admonished for attempting to introduce evidence about

14 potential uses, Mr. Levin asked Mr. Masin "how [the transponders

15 were] actually used by . . . pharmaceutical companies," despite Mr.

16 Masin's testimony that he had no idea which companies those might

17 be.  (Tr. 996.)

18              **3.  Improper Corrective Advertising Evidence**

19      Plaintiffs' counsel also attempted to improperly introduce

20 Nancy Budd's report into evidence through Ms. Masin.  (Tr. 40.)  Ms.

21 Budd's report on corrective advertising had been excluded by the

22 Court.  Nonetheless, plaintiffs' counsel stated, during opening

23 argument on the damage phase, that "Miss Masin will tell [the jury]

24 that the cost of corrective advertising will fall in the range

25 between 10 and 20 million dollars."  (Tr. 4250-51.)  Plaintiffs'

26 counsel tried to introduce the same previously excluded report, only

27 with a different cover sheet.  Those tactics drew the following

28 remarks from the Court:

                              -69-

I hate to keep doing this, but I will tell you that I have
been absolutely stunned today.  I have been stunned and
from the beginning, the fact that the lawyers — let's
forget about the princip[als] — would offer the exhibit of
Miss Masin's which was clearly, clearly Nancy Budd's
analysis and attempt to offer it as her own work.
Counsel, I cannot imagine that you could ethically do
that, and I was astonished to — you obviously knew what
was in that exhibit.  You obviously knew how it was done.
And you allowed Miss Masin to offer this, clearly
misrepresenting what it was.  That is an ethical
violation."

(Tr. 5125.)

In spite of the exclusion of the report, Plaintiffs' counsel

nonetheless did everything he could to get the $10,800,000 purported

corrective advertising figure in front of the jury.  For example,

counsel asked:  "Did you make some calculation as to the cost of

this advertising?"  Given the opportunity, the witness blurted out

"Yes, it would be the 10.8 million dollars."  An objection was

raised, sustained, and the testimony was stricken.  Again, counsel

asked the witness what kind of funding plaintiffs needed to conduct

their corrective advertising campaign.  (Tr. 4495.)  Before an

objection could be raised, the witness blurted out "10.8 million

dollars."  (Tr. 4495.)  Once again, the objection was sustained.

### 4.   Improper Introduction of Evidence Relating to Alleged Negotiations Between Plaintiffs and Destron-Fearing

Also, plaintiffs' counsel improperly implied that the

injunction entered against them in the Destron-Fearing case was

irrelevant.  First, Mr. Masin was not allowed to testify as to

purported negotiations with Destron for a license that would allow

plaintiffs to sell their ID-100 chip.  (Tr. 875-876.)  Faced with

this evidentiary barrier, Mr. Levin nonetheless stated in open

court, before the jury, that "Since we are on the topic of that

litigation [Destron patent litigation], I do have a few questions

-70-

1   for you.  Your Honor, we have no objection to whatever details

2   concerning the negotiations coming in that Mr. Lippert was

3   interested in."  (Tr. 1051.)  The negotiation Mr. Levin was

4   referring to were purported oral negotiations between Mr. Masin and

5   Destron which would have allegedly allowed plaintiffs to use the

6   enjoined product under a license agreement with Destron.  However,

7   due to Mr. Masin's refusal to discuss such negotiations at his

8   deposition (because of an alleged confidentiality agreement), the

9   "questions" were never asked.  The import of Mr. Levin's statement,

10  in front of the jury, was to imply that Mr. Masin would soon be able

11  to use the enjoined product.

12              **5.    The "Big Boat" Theme**

13       In response, plaintiffs argue that "it is clear that Pfizer's

14  hodgepodge of complaints about isolated incidents of purported

15  attorney misconduct is baseless and, in any event, cannot rise above

16  the level of 'harmless error.'"  (Pls.' Mem. Opp'n Renewed Motion

17  for Mistrial at 1.)  Perhaps, in his haste to oppose defendant's

18  motion, plaintiffs' new counsel failed to review the trial

19  transcripts.  Defendant had to raise 778 objections, which were

20  sustained, to prevent the introduction of improper evidence.

21  Furthermore, the Court had to raise an additional 67 more objections

22  for conduct which was so blatantly in violation of the Federal Rules

23  of Evidence that not to do so would have been clear error.[48]

24       This barrage of objections prompted by plaintiffs' counsel's

25  repeated ignorance or complete disregard of the Federal Rules of

26  Evidence, and the Court's rulings and admonitions, created the

27  _____

28       [48]    Although the Court does not base its decision on the
    mere number of sustained objection, that number certainly
    illustrates the flavor of this case.

1  impression that the defendant and the Court "conspired" against the

2  small company in an effort to hide the true facts.  This impression

3  served plaintiffs well, as it became their main theme on closing.

4  Although the impression played well into plaintiffs' "Big Boat v.

5  Little Boat" theme, it deprived defendant of an important right.

6  Certainly, no one is entitled to a perfect trial.  However, everyone

7  is entitled to a fair one.  This, Pfizer did not get.  As a result,

8  the Court orders a new trial.[49]

9  **V.    CONCLUSION**

10      **A.    Motions For Judgment as a Matter of Law And For New Trial**

11          For the foregoing reasons, the Court finds: (1) That California

12  common law would not recognize a claim for reverse confusion lacking

13  a showing that the parties actually competed.  Thus, defendant's

14  Motion for Judgment as a Matter of Law on Plaintiffs' California

15  Common Law Unfair Competition Claim and Their Claim for Punitive

16  Damages is GRANTED, thereby VACATING the jury's punitive damage

17  award.  In the alternative, the motion for a New Trial On These

18  Issues is also GRANTED.

19          (2) As to Motion No. 2, the Court does not recognize an award

20  of reasonable royalty lacking any evidence that plaintiffs would

21  have been willing to license their mark.  Thus, the jury's

22  $3,000,000 reasonable royalty award is VACATED.  Moreover, although

23

---

24          [49]    Plaintiffs argue that the motion is procedurally flawed
25  because (1) most of the issues are untimely and (2) the Court has
    already denied the relief Pfizer seeks.  Those contentions are
26  without merit, Pfizer preserved all the current objections either
    through oral mistrial motions, or objections on the record.
27  Finally, the Court never decisively decided the substance of
    Pfizer's motion.  Rather, the Court asked Pfizer to do "a new
28  briefing, citing to the record."  That briefing was intended to
    bring all the issues before the Court at once.

1   plaintiffs have presented sufficient evidence to support the jury's

2   likelihood of confusion finding, defendant is entitled to a new

3   trial because of improperly admitted evidence.  Even if defendant is

4   not entitled to a new trial on the issue of likelihood of confusion

5   and even though plaintiffs have presented sufficient evidence to

6   support actual injury, plaintiffs have not presented sufficient

7   evidence to support the $5,000,000 general compensatory damage

8   award.  The Court finds that the evidence supports a damage award of

9   no more than $500,000.  As a result, plaintiffs must choose between

10  a remittance of $500,000 or a new trial on the issue of general

11  damages.  Thus, defendant's Motion for Judgment as a Matter of Law

12  on Plaintiffs' Trademark Infringement, Unfair Competition, False

13  Association or Sponsorship and Fraudulent Business Practices or, in

14  the Alternative for a New Trial is GRANTED IN PART and DENIED IN

15  PART.

16      (3) Additionally, defendant is entitled to a judgment as a

17  matter of law on the issue of willfulness and on the issue of

18  malice, oppression, and fraud.  Thus, Pfizer's Motion for Judgment

19  as a Matter of Law in Favor of Pfizer Inc. on the Issues of

20  Willfulness Under Federal Law and Malice, Fraud, or Oppression Under

21  State Law is GRANTED.  Also, in the alternative, the Court finds

22  that the verdict is against the clear weight of the evidence and

23  thus GRANTS defendant's alternative motion for a new trial on those

24  issues.

25      (4) Furthermore, in the alternative, even if the punitive

26  damage award is not vacated, defendant is entitled to a remittance,

27  as the punitive damage award is excessive under California and

28  Federal law.  Thus, plaintiffs are entitled to recover no more than

-73-

1  $1,500,000 in punitive damages.  If plaintiffs refuse that

2  remittance, defendants are entitled to a new trial.  Thus,

3  defendant's Motion for Judgment as a Matter of Law on the Jury's

4  Punitive Damage Award or, in the Alternative, for a New Trial or

5  Remittitur on the Award is GRANTED IN PART and DENIED IN PART.

6      (5) In the alternative, defendant is also entitled to a new

7  trial based on attorney misconduct.  Thus, defendant's Renewed

8  Motion for Mistrial is GRANTED.

9      (6)  Additionally, defendant's Motion for Judgment as a Matter

10  of Law Based on the Improper Admission of the Jacoby Physician

11  Survey and Accompanying Testimony by Dr. Jacoby is DENIED.

12      (7)  Defendant's Motion for a New Trial on Damages Based on the

13  Erroneous Admission of Trial Testimony by Weston Anson is DENIED.

14      (8)  According to the above orders, the Court vacates any

15  portions of the February 29, 2000 Judgment on the Verdict and

16  February 21, 2000 Minute Order which are inconsistent with this

17  Order, including, but not limited to, the injunction, the

18  cancellation of Pfizer's Trademark registration (Reg. No.

19  2,182,833), and the award of prejudgment interest.  Furthermore, the

20  Court vacates any assessments of costs.  However, the Court's

21  findings of facts and conclusion of law relating to defendant's

22  profits in this Court's February 21, 2000 Minute Order remain

23  undisturbed.  The Court still finds that Pfizer did not realize a

24  profit on the sale of the Trovan drug.

25      **B.   Other Motions**

26      As to the remaining motions, the Court rules as follows.

27  Defendant's Motion for Clarification of the February 24, 2000 Minute

28  Order is DENIED.  Defendant's Application for the Issuance of an

1  Order Re: a Letter of Request for the Taking of Evidence Pursuant to
2  the Hague Convention is DENIED.  Both defendant's and Plaintiffs'
3  Motions to Re-Tax Costs are DENIED.  Finally, plaintiffs' Motion for
4  Award of Attorneys' Fees and Non-Taxable Expenses is DENIED.

6  IT IS SO ORDERED.
7  DATED: _May 23, 2000_

8  LOURDES G. BAIRD
   United States District Judge

-75-