THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Trovan, LTD et al.<br><br>            Plaintiffs,<br><br>  v.<br><br>Pfizer, Inc.,<br><br>            Defendant. | CV 98-0094 LGB (Mcx)<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This action presents the question of whether defendant Pfizer, Inc.'s ("Pfizer" or "Defendant") use of the trademark "TROVAN" for a line of antibiotics infringes plaintiffs Trovan, Ltd.'s ("Trovan") and Electronic Identification Devices, Ltd.'s ("EID")[1] right to the use of the trademark "Trovan" for its line

---

[1] Trovan and EID are collectively referred to as "Plaintiffs."

1

of miniature electronic tracking devices. By the instant motion, Defendant seeks a summary judgment as to Plaintiffs' remaining claim for trademark infringement under the Lanham Act.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Defendant's Product

Pfizer is a research-based, global pharmaceutical company that has been doing business in the United States since 1942. Declaration of Christine A. Pagac in Support of Defendant's Summary Judgment Motion ("Pagac Decl. I"), Exh. R at ¶ 2. In the early 1990's, Pfizer began to develop a new antibiotic compound, trovafloxacin, for the treatment of a wide variety of infections. Pagac Decl. I, Exh. A at 1665, 1670. Pfizer chose the name "TROVAN" for its new antibiotic to suggest its ingredient and purpose: a combination of the prefix "TROV," from the generic name of the compound trovafloxacin, and the suffix "AN," for antibiotic. See Pagac Decl. I, Exh. A at 1685-86. Pfizer filed an application in the United States Patent and Trademark Office ("PTO") on October 28, 1996 to register TROVAN in International Class 5 (Pharmaceuticals), for an antibiotic preparation, based on Pfizer's intent to use the mark. See Pagac Decl. I, Exh. S. The application was approved by the PTO and was not opposed. The PTO issued a Certificate of Registration for Pfizer's TROVAN mark on August 18, 1998. See id., Exh. T. Pfizer introduced its TROVAN antibiotic to the market in February 1998. The antibiotic was sold only by prescription and only for human use. See id.,

Exh. A at 1658, 1679-81. The TROVAN antibiotic was marketed exclusively to healthcare professionals. See id., Exh. A at 1608, 1658-59, 1665, 1679-81. TROVAN was never marketed or sold directly to potential patients. See id., Exh. A at 1608, 1658-59, 1665, 1679-81. Initially, TROVAN was approved for use to fight fourteen different infections. See id., Exh. A at 1670. TROVAN's distribution has since been limited due to its association with liver dysfunction. See id., Exh. A at 4803, 4830-31. Due to this limitation, Pfizer discontinued all marketing of TROVAN as of June of 1999. Declaration of Romana Pylyp in Support of Defendant's Motion for Summary Judgment ("Pylyp Decl.") at ¶ 2.

### B. Plaintiffs' Products

Since the early 1990s, Plaintiffs have been selling passive transponder systems designed to overcome the limitations of bar codes for identification purposes under the name Trovan. May 2000 Order Granting and Denying Defendant's Post Trial Motions; and Denying Plaintiffs' Post Trial Motions ("May 2000 Order") at 2. On July 2, 1991, the PTO issued plaintiff Trovan a federal trademark registration for the name "Trovan." Id. Plaintiffs sell different kinds of transponders for different uses. The Trovan ID-100A transponder was used for the identification of animals, including pets. Id. This transponder was sold as the Trovan ID-100 with a syringe to inject the transponder under the animal's skin. Id. In 1996, Trovan was permanently enjoined

3

from selling this product because it infringed on Destron-Fearing's patent. Id.

In October 1997, Plaintiffs licensed the Zip Quill technology from Hopliet B.V. ("Hopliet"). Id. The Trovan Zip Quill is a radio frequency identification device encased in a starch compound with the microchip 100A in it surrounded by the starch compound. The Trovan Zip Quill was designed especially for animal identification. Id. Plaintiffs decided to use the Zip Quill as an alternative to the syringe for implanting transponders so as to circumvent the permanent injunction preventing sales of the ID-100. See Pagac Decl. I, Exh. A at 500-01. Plaintiffs' other transponders have been used in a variety of industrial and commercial settings for identification purposes, including laundry and to ear tag livestock. May 2000 Order at 2-3.

### C. Procedural Background

Plaintiffs filed their complaint against Pfizer in December of 1997, alleging that Pfizer's use of the trademark "TROVAN" for its antibiotic infringed Plaintiffs' right to use the "Trovan" trademark for its electronic tracking devices. Plaintiffs pursued to trial three causes of action: 1) Trademark Infringement under the Lanham Act; 2) False Designation; and 3) Unfair Competition.

By Order dated February 24, 1999, this Court denied Defendant's motion for summary judgment as to Plaintiffs' three claims (the "February 1999 Order").

Following trial, which resulted in a jury verdict in Plaintiffs' favor on all claims, Pfizer moved for a mistrial due to attorney misconduct, and for judgment as a matter of law, or, in the alternative, for a new trial on all claims. The Court granted Pfizer's motion for judgment as a matter of law on Plaintiffs' common law unfair competition claim, and granted Pfizer's motion for a mistrial. See May 2000 Order at 72, 74. The Court further granted a new trial as to the issue of likelihood of confusion, vacating the judgment in Plaintiffs' favor. See id. at 52. By Minute Order dated November 1, 2002, the Court set forth the remaining issues for the new trial as follows: 1) Plaintiffs' federal trademark infringement claim based on the doctrine of reverse confusion; and 2) Plaintiffs' damages on the basis of the remaining claim, which cannot exceed $ 500,000 - the value of Plaintiffs' Trovan mark. Defendant has now filed the instant motion for summary judgment as to the remaining trademark infringement claim based on the doctrine of reverse confusion.

III. **LEGAL STANDARDS**

A. **Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if "the

5

Case 2:98-cv-00094-LGB-Mc Document 916 Filed 06/20/03 Page 6 of 18 Page ID #:183

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To avoid summary judgment, the non-movant must set forth specific facts showing that there remains a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." Id. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. Id. at 325. If the non-moving party's evidence is merely colorable or is not significantly probative, then summary judgment may be granted. Id.

**B.    Trademark Infringement Law**

In order to prevail on their claim of trademark infringement, Plaintiffs must prove there is a "likelihood of confusion" among reasonably prudent consumers as a result of the

6

use of confusingly similar trademarks. 15 U.S.C. § 1141(1)(a); see also Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1457 (9th Cir. 1991). The confusion must be probable, not simply a possibility. Murray v. Cable NBC, 86 F.3d 858, 861 (9th Cir. 1996). Summary judgment in trademark infringement actions is proper where the undisputed facts demonstrate there is no likelihood of confusion. Murray v. Cable NBC, 86 F.3d 858, 860-61 (9th Cir. 1996). Additionally, where the products are totally unrelated, there can be no likelihood of confusion as a matter of law. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979).

The standard factors considered for determining a likelihood of confusion are: 1) strength of the mark; 2) proximity of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used by each party with respect to its own goods; 6) type of goods and the degree of care likely to be exercised by the purchaser; 7) defendant's intent in selecting the mark; and 8) likelihood of expansion of the product lines. AMF, Inc., 599 F.2d at 348-49. These factors were "intended to guide the court in assessing the basic question of likelihood of confusion." E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir. 1990). "In the usual infringement case, these factors are applied to determine whether the junior user is palming off its product as those of the senior user." Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1130 (9th Cir. 1998).

There are two different types of confusion claims in trademark cases: forward confusion and reverse confusion.[2] Dreamwerks Prod. Group, Inc., 142 F.3d at 1130. In reverse infringement cases, there is no question of palming off since neither junior nor senior user wishes to siphon off the other's good will. Instead, the question in such cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user. Id. at 1130.

## IV.  ANALYSIS

In its moving papers in support of its motion for summary judgment, Defendant proffers the following two arguments: **1)** judgment should be entered in Pfizer's favor because, as a matter of law, the parties' Trovan goods are unrelated; and **2)** as a matter of law, Plaintiffs cannot establish a likelihood of confusion.

### A.   The Relatedness of the Goods

This Court previously recognized that "where the nature of the goods is undisputed, the relatedness of the goods is a matter of law. It is also true that where the products are totally unrelated there can be no confusion as a matter of law." May 2000 Order at 40. In denying Defendant's post-trial motion for

---

[2] It is undisputed that this case is one of reverse confusion. See Plaintiffs' Statement of Genuine Issues in Opposition to Defendant's Motion for Summary Judgment, Conclusions of Law at ¶ 6.

8

judgment as a matter of law on the issue of likelihood of confusion, this Court stated:

> Although it is true that plaintiffs' products are not currently used for human application, it is undisputed that plaintiffs' Zip Quill contains an antibiotic - amoxycillin.... the jury could have found that the presence of an antibiotic in one of plaintiffs' products rendered their mark somewhat related to defendant's product - an antibiotic.

May 2000 Order at 42-43. Thus, the Zip Quill plus amoxycillin was the basis for the Court's ruling in May of 2000 denying post-trial judgment in favor of Defendant based on the unrelatedness of the goods.[3]

In the instant motion, Defendant argues that "Plaintiffs never actually had the right to market or sell the Zip Quill *plus* amoxycillin - a fact Mr. Masin well knew before he testified at

---

[3] In its February 24, 1999 Order Denying Defendant's Motion for Summary Judgment ("February 1999 Order"), the Court, in declining to find that the parties' Trovan products were unrelated as a matter of law, stated: "Because Pfizer is a dominant producer of a diverse line of animal health products, veterinarians would be unsurprised were Pfizer to produce and market an electronic animal identification system like Trovan's." February 1999 Order at 23:6-9. The Court also cited to Plaintiffs' marketing of the Zip Quill with an antibiotic as another basis for not finding the parties' products unrelated as a matter of law. See id. at 23:21-24:16. The Court notes that a ruling denying summary judgment is not final and may be reconsidered at any time. See Preaseau v. Prudential Ins. Co. of America, 591 F.2d 74, 79-80 (9th Cir. 1979) (order denying a motion for summary judgment is "subject to reconsideration by the court at any time").

length to the contrary at trial."[4] Mem. of P's & A's in Support of Def.'s Motion at 11:25-27 (emphasis in original). Specifically, Defendant points to an August 16, 1999 letter from Hopliet to Joseph Masin ("J. Masin"), president of EID (the "August 1999 Letter"). In the August 1999 Letter, Hopliet informed J. Masin that the agreement between Hopliet and Trovan "specifically excludes the use of pharmaceutical products in combination with Hopliet's injectiles." Declaration of Dr. Gijsbert Van De Wijdeven ("Wijdeven Decl."), Exhs. D & E. In other words, according to Defendant, "the Trovan Zip Quill plus amoxycillin never existed." Mem. of P's & A's in Support of Def.'s Motion at 12:2-3. Defendant also offers a March 13, 2002 letter from Hopliet to J. Masin terminating, as of that day, the Distribution Contract between Hopliet and Trovan (the "Termination Letter").[5] Wijdeven Decl., Exh. H.

---

[4] At trial, on August 20, 1999, Mr. Masin, President of plaintiff EID, testified as follows:
    Q: Are there any plans to use it for humans or not?
    A: Yes.
    Q: What are those plans?
    A: The product can be used also without these transponders. The product is to used [sic] Trovan Zip Quill as a delivery device for pharmaceuticals.
Pagac Decl., Exh. A at 795-96.

[5] The Termination Letter states in relevant Part:
    Further to our meeting on March 10, 2002 in Amhem, the Netherlands, this is to inform you, that as of today, March 13, 2002, we terminate the Distribution Contract entered into between Hopliet BV and Trovan limited on October 30, 1997, effective immediately.
    You have threatened me with personal harm if I would not

In their Opposition to Defendant's summary judgment motion, Plaintiffs argue that their goods are related to Pfizer's TROVAN antibiotic because the Zip Quill has been sold for use in animals with a dose of antibiotic to prevent infection at the injection site. Mem. of P's & A's in Support of Pls.' Opp. at 14. Plaintiffs also assert that the Hopliet Distribution Contract grants Plaintiffs the right to make products based in the Hopliet Zip Quill technology concerning the Zip Quill for "use in all suitable identification applications."[6] Pls.' Mem. of P's & A's

---

> comply with your demands.
> Time and again you refused in actual fact to provide adequate information as to the Trovan - Pfizer trial and you refused again [on] March 10, 2002, while obviously we are entangled in and consequently affected by that trial somehow. You have grossly breached the Mutual Non-Disclosure Agreement and used confidential information for the exploitation of your own purposes.
> You have grossly breached the Distribution Contract now terminated by using the contract for purposes absolutely not intended and not agreed upon.
> ...
> It is highly likely that your actions have endangered or even damaged our interest as an R&D start-up with Pfizer, being among the most important potential customers.

Wijdeven Decl., Exh. H.

[6] The "Recitals" Section of the Hopliet Distribution Contract states in relevant part that:
> [Hopliet] represents that it has developed technology related to implants and implantation systems for delivery of pharmaceutical products and electronic identification devices in animals. Hopliet is willing to grant TROVAN the right to manufacture and market products based on this technology for use in all suitable identification applications under the terms and conditions of this Contract.

11

at 6:13-15. Plaintiffs go on to argue that "Pfizer may not rely upon the hearsay declaration of Mr. Wijdeven ... to negate the rights granted under the Distribution Contract."[7] Id. at 6:18-20.

Additionally, Plaintiffs contend that Hopliet improperly purported to terminate the Distribution Contract without identifying any of the contractually provided grounds therefor. Thus, Plaintiffs go on to conclude that "[b]ecause the Hopliet Distribution Contract was never properly terminated, Trovan was entitled to and did exercise its right under paragraph 2 of the Distribution Contract to secure an alternative source for the Zip Quill...." Pls. Mem. of P's & A's at 10:1-3. In support of Plaintiffs' argument, J. Masin states in his declaration:

> Accordingly, on or about November 5, 2002, I, on behalf of Trovan, Ltd. and EID, entered into an agreement with an Argentine pharmaceutical company called Instituto Rosenbusch for the manufacture of the Zip Quills. Production of the Zip Quills is under way.

---

Wijdeven Decl., Exh. A, Recitals at A.

[7] It is undisputed that Hopliet is not a party to this action and the interpretation of the Distribution Contract is not before this Court for adjudication. Additionally, in ruling on the instant summary judgment motion, the Court does not rely on the Wijdeven Declaration to reach its holding; therefore, the Court need not address Plaintiffs' evidentiary objections to the Wijdeven Declaration.

> EID representing Trovan, Ltd. has contracted for the manufacture of Trovan Zip Quills with Instituto Rosenbusch, a company in Argentina. One version of the Zip Quill will be with transponders only and the others will be produced including a slow release generic anabolica for use in cattle. Trovan, Ltd. has after consultation with the FDA submitted a corresponding request or issuance of a Letter of Determination to the FDA.

J. Masin Decl., ¶¶ 41-42.

Furthermore, Plaintiffs offer the declaration of Wayne Culberth, Vice Chairman of Tracene Technologies, Inc. dba InfoPet Identification Systems (the "Culberth Declaration"), who states that, in 1998, his company purchased 2,000 Trovan transponders "with the Zip Quill delivery system which contained the antibiotic amoxycillin." Culberth Decl., ¶ 6. Culberth further states that "[t]hese antibiotic-containing transponders were sold to animal shelters, veterinarians, zoos and snake farms." Id. Defendant objects to paragraph 6 of the Culberth Declaration on grounds that "it is irrelevant, especially since Plaintiffs never had a right to market the Zip Quill with antibiotics." Defendant's Objections to the Declaration of Culberth, ¶ 4. The Court agrees. As further discussed below, Plaintiffs have not offered any evidence that they are entitled to market their Trovan Product with an antibiotic, e.g., amoxycillin.

Plaintiffs do not deny that their rights to market their product in conjunction with an antibiotic stem from the

13

Distribution Contract with Hopliet. Instead, Plaintiffs contend that because Hopliet has breached or failed to perform under the Distribution Contract, they are entitled to and have in fact sought to have the Zip Quills with antibiotics manufactured by another entity - Instituto Rosenbusch.

Preliminarily, the Court notes that the October 14, 1997 letter from Wijdeven of Hopliet to J. Masin does not demonstrate that Hopliet permitted Plaintiffs to sell the Zip Quill with an antibiotic.[8] Rather, the letter merely demonstrates that Hopliet expected Plaintiffs to seek approval from the FDA in order to add a small dose of amoxycillin to the Zip Quill for use in animals.[9] The Court has reviewed all the documents submitted by Plaintiffs and Defendant in conjunction with the instant motion and finds no evidence that the FDA has granted such approval. Specifically, the Court notes that any approval granted by the FDA has been

---

[8] According to Hopliet, no such agreement ever existed. See Wijdeven Decl., ¶¶ 3,4.

[9] The October 14, 1997 letter states in relevant part:
> The intention is to introduce into each [Zip Quill] 5 milligram Amoxycillin. If 1 animal has a body weight of 50 kg (young born calf) ..., than add only 1/10,000,000 =.1 ppm (parts per million) to the animal. A normally accepted MRL (Maximum Residue Level) is 1 ppm, so I stay ten times beneath the normal accepted MRL. The biological halftime of Amoxycillin is counted in hours. It can be expected that there would not be any with holding-period at all, except on the site of injection (which is rendered).
> Please find the specification of the starch I use for the production of [the Zip Quill] ... This should be convincing for the FDA/USDA.

J. Masin Decl., Exh. A.

14

limited to the use of Plaintiffs' electronic transponders for identification purposes only, *i.e.*, without the use of amoxycillin. See J. Masin Decl., Exh. N, Feb. 15, 1996 FDA letter re Trovan Product ("In light of these findings, we do not now plan to recommend or initiate an enforcement actions against the use of Trovan brand Model ID-100 transponder in food animals provided: ... the transponder is used for the sole purpose of animal identification"); Pagac Declaration in Support of Def.'s Reply ("Pagac Decl. II"), Exh. A, Jan. 16, 1998 Application for Certification letter from plaintiff EID to FDA (stating that "[t]his application addresses specifically the use of the implantable soluble delivery device for the Trovan ID-100 transponder previously approved by the FDA"); Pagac Decl. II, Exh. B, Mar. 8, 1998 Response Letter from the FDA ("We have reviewed your submission and find that there are no human food safety concerns for the 'substantially destructurized starch' Trovan IDD when used to facilitate implantation of an implantable electronic identification product (Trovan Model ID-100 transponder)"); and J. Masin Decl., Exh. G, Mar. 13, 2000 letter from J. Masin to Wijdeven of Hopliet ("I have filed for Hopliet's benefit an application with the FDA for the use of the ZIPQUILL in human applications. Last year, I have mailed you [sic] a copy of their response, stating that the ZIPQUILL as such does not require FDA approval, only the final product incorporating the specific pharmaceutica [sic] in conjunction with the ZIPQUILL would be subject to the approval process, which of course would

entail a significant effort on the part of the manufacturer of the pharmaceutica [sic] in question. We have discussed several possibilities whereby Trovan could be of assistance in the effort to identify a strategic partner for Hopliet.").

Plaintiffs argue that their products are related to Pfizer's TROVAN antibiotic because "the Trovan transponder systems are being expanded to human application." Pls.' Mem. of P's & A's in Support of Opposition at 14:21-22. At trial, Mr. Masin testified that he was in the process of expanding his products into the market of human medicine. See Pagac Decl. I, Exh. A at 1035, 1278. Yet, Plaintiffs' only new product - the ID-100IH transponder - is not a human medical device.[10] The FDA has approved the ID-100IH "for use in personal identification application only," and specifically prohibited Plaintiffs from marketing the ID-100IH "with claims of medical utility." See J. Masin Decl., Exh. P, Nov. 4, 2002 letter from the FDA to J. Masin.

Plaintiffs also argue that their transponders are related to Pfizer's TROVAN antibiotic because Pfizer sells a "range of

---

[10] It is not clear whether Plaintiffs are suggesting that the ID-100IH transponder can be implanted with the Zip Quill technology. Plaintiffs did offer as evidence a February 14, 2003 letter from J. Masin to the FDA seeking a "Letter of Determination" to use Plaintiffs' electronic transponders with the Zip Quill in animals. See J. Masin Decl., Exh. T. Regardless, the FDA has to-date only approved the implantation of the ID-100IH by use of a scalpel or 10-gauge needle and without any antibiotic. J. Masin Decl., Exh. P, Nov. 4, 2002 letter from the FDA to J. Masin.

animal health care products." Mem. of P's & A's in Support of Pls.' Opp. at 14:24-25. The Court notes that the only Pfizer product relevant to the determination of relatedness of the goods is the allegedly infringing product, *i.e.*, the TROVAN antibiotic. See <u>Toho Co. v. Sears, Roebuck and Co.</u>, 645 F.2d 788 (9th Cir. 1981) (in finding that, as a matter of law, Sears Roebuck's "Bagzilla" garbage bags were unrelated to "Godzilla" toys and literary works, the court looked only at the goods Sears sold which bore the "Bagzilla" name - not the full panoply of goods that Sears offers under any mark, which would include toys.). Plaintiffs do not cite any cases to support their argument that Pfizer's animal healthcare products are in any way relevant to the Court's determination of the relatedness of the goods in this case.

At bottom, Plaintiffs have not raised a genuine issue of material fact that they are entitled to use their Trovan product in conjunction with an antibiotic. As such, the Court finds that, as a matter of law, Plaintiffs' Trovan product is unrelated to Defendant's TROVAN antibiotic.

**B. Likelihood of Confusion**

Because the Court has found that the parties' Trovan products are unrelated as a matter of law, the Court need not address Defendant's second argument regarding the likelihood of confusion.

17

## V. CONCLUSION

Based on the foregoing, the Court grants Defendant's motion for summary judgment as to Plaintiffs' trademark infringement claim - the only remaining claim in this case.

**IT IS SO ORDERED.**

Dated: June 20, 2003

LOURDES G. BAIRD
United States District Judge